COOPERATIVE REFINERY ASS'N v. CONSUMERS PUBLIC POWER DIST. et al.

CONSUMERS PUBLIC POWER DIST. v. COOPERATIVE REFINERY ASS'N.

Nos. 14149, 14152.

United States Court of Appeals Eighth Circuit.

Aug. 3, 1951.

Rehearing Denied Sept. 7, 1951.

Lester A. Danielson, Scottsbluff, Neb. (F. R. Olmsted, Kansas City, Mo. and Thomas F. Neighbors, Scottsbluff, Neb., on the brief), for Cooperative Refinery Ass'n.

Robert G. Simmons, Jr., Scottsbluff, Neb. (James G. Mothersead, Floyd E. Wright, Scottsbluff, Neb., Clarence A. Davis, Daniel Stubbs, and George A. Healey, all of Lincoln, Neb., on the brief), for Consumers Public Power Dist.

Peter H. Holme, Jr., Denver, Colo. (J. Churchill Owen and Holme, Roberts, More, Owen & Keegan, all of Denver, Colo., on the brief), for Terry Carpenter and Hazeldeane Carpenter.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one brought by Consumers Public Power District against Cooperative Refinery Association, to recover damages,

under Nebraska law, for breach of a contract to sell fuel oil. On a trial without a jury, the court awarded damages for a part of the contract term but not for the full remaining period covered by the contract. Cooperative has appealed from the recovery allowed against it, and Consumers has cross-appealed from the limiting of its damages to the partial period.

Cooperative's appeal covers also the trial court's dismissal of a third-party complaint filed by Cooperative against Terry Carpenter and Hazeldeane Carpenter as indemnitors of any liability on the part of Cooperative to Consumers. The contract which was the basis of Consumers' suit against Cooperative had been made between the predecessor of Consumers and a refinery corporation whose capital stock was owned by Terry Carpenter. Cooperative bought all of the capital stock from Carpenter and then had the refinery plant and the other assets of the corporation transferred to itself in a distributive liquidation. Carpenter and his wife had executed an indemnity agreement in favor of Cooperative as to some of the liabilities of the refinery corporation. It was Cooperative's contention that, if any obligation existed against it by operation of law on Consumers' contract, such liability was within the protection of the indemnity agreement. In dismissing the third-party complaint, the trial court held that, as to the liability imposed by it upon Cooperative on Consumers' contract, the indemnitors were entitled to exoneration on principles of estoppel.

The primary question for our consideration is whether Consumers' contract had been so superseded as to be terminated and, if so, whether in all its rights or in its executory operation alone, by a subsequent "arrangement" agreed upon between Cooperative and Consumers, under which Consumers had thereafter made its purchases of fuel oil from Cooperative during the remaining period covered by the contract on a different basis as to price, billing and discount than was provided in the original contract. The parties are in accord that the subsequent arrangement was a legally separate one from the original contract, so that the issue involved is not one of modification but of co-existence or exclusion.

The original contract was one by which the refinery corporation had agreed to furnish the fuel oil requirements of the electric power plants operated at the time by Consumers' predecessor in Sidney and Ogallala, Nebraska, at a base price, with adjustment on differential to any increase in the market price of crude oil, for a term of five years from May 4, 1939. Cooperative acquired the capital stock of the refinery corporation and took over the operation of the refinery plant in December, 1941. In its transaction with Carpenter and in relation to its dissolution of the refinery corporation, Cooperative had refused to make any assumption of the fuel oil contract and had given notice to Consumers' predecessor that it recognized no obligation on its part as to the contract. It indicated its willingness, however, to sell oil for the power plants on the basis of its own prices and terms.

Consumers' predecessor had contended that Cooperative owed the obligation of performing the contract, but it entered into negotiation with Cooperative and the parties orally agreed upon a price, billing and discount basis for the current supplying of oil. The dealings of the parties thereafter, in the ordering, supplying and payment for oil, were had under this arrangement, until Cooperative gave notice to Consumers that, as of October 1, 1942, it would no longer supply oil "on the present basis." The price, billing and discount basis under the arrangement had so operated that Consumers' predecessor and Consumers had sustained no pecuniary loss during this nine-months period from Cooperative's refusal to recognize and perform the 1939 contract. The suit therefore does not involve any claim of damages for breach as to this period, nor has Cooperative made any contention that this arrangement had operated to affect the original contract in any way as of that time.

From October, 1942, to May, 1943, without engaging in further negotiation with Cooperative, Consumers, purchased its oil requirements from another refinery, but at a cost to it for the period of $9,672.31 in

excess of what would have been the price under the 1939 contract. It was for breach of the contract as to this period and in this amount that the trial court allowed Consumers a recovery.

In May, 1943, Consumers and Cooperative again entered into negotiation and orally agreed upon an arrangement for a resumption of the supplying of oil to Consumers by Cooperative. Cooperative made confirmation of the price aspect of this arrangement in a letter stating that it would deliver "heavy gas oil" to Consumers on the basis of "the low of ordinary industrial gas oil" plus ".026 freight and differential" per gallon to the Sidney plant and ".029 freight and differential" per gallon to the Ogallala plant. The market "low" as of the date of the letter was set out therein, and the letter further contained a request that "In giving us your orders we would like to have you give them two days in advance for the reason that our trucks might be busy * * *." Consumers made use of the arrangement and its terms to purchase its oil needs through the remaining period covered by the 1939 contract—although other sources of supply also were available to it. It made payment to Cooperative for these purchases, in regular course, of the sum of $8,785.16 in excess of what the price would have been under the original contract. The trial court refused to allow a recovery in damages for these excess payments, and it is this denial which is the subject of Consumers' cross-appeal.

The court rested its denial of such damages upon the ground, not that the original contract had been so superseded by the 1943 arrangement or the performance under it as to leave nothing subject to breach, but that, while the contract should be recognized as having continued in all its rights, the excess paid under the arrangement was in legal effect a voluntary payment by Consumers and that to allow damages therefor would be equivalent to permitting Consumers to recover money voluntarily paid.

It was the court's view that under Nebraska law no superseding, rescinding or abandoning of the contract could properly be held to have occurred, from the making of the 1943 arrangement or the performance under it, because "there was no meeting of the minds" as to any such object or result, in that Consumers had never, either expressly or by reasonable inference, agreed in fact to a termination or to an abandonment of the contract in any respect. There was a finding to the effect that, although the subsequent arrangement was the product of mutual negotiation and had been utilized by Consumers throughout the remaining year of the contract term, Consumers at all times intended the original contract to remain in force and to require Cooperative to reimburse it for such financial injury as it sustained, both in the purchases earlier made from another refinery and in those made from Cooperative under the 1943 arrangement.

This finding as to Consumers' lack of intention and agreement in fact to terminate or abandon the original contract is binding on us, for purposes of such legal effect as it compels or as the trial court was entitled to accord it in the situation. But whether or not the court was entitled to hold that the legal effect of Consumers' lack of intention and agreement in fact to supersede the contract was to leave it operative in all respects as against the arrangement and the parties' actions under it is, however, not controlling of Consumers' cross-appeal. The denial of damages complained of would in either event be entitled to be affirmed.

If the court was in error in its view of Nebraska law as to the contract having coexisted with the arrangement and survived the performance thereof, from Consumers' lack of intention and agreement in fact to terminate it, then the claim of breach for the period involved in the cross-appeal necessarily would be without any legal foundation on which to rest. Again, if the court was right in according the contract coexistence and its incidents survival, then Consumers' payment of the excess over the contract price on the basis of the arrangement was in our opinion entitled to be treated by the trial court as legally having been voluntary in nature.

Other market sources of fuel oil were available to Consumers, as has previously

been indicated, so that its dealings with Cooperative under the arrangement were not controlled by business compulsion or other form of legal duress. Nor is there anything in the Nebraska cases that points to any recognition of that rule which obtains in a limited number of jurisdictions, under which it is held that a buyer must mitigate his damages by purchasing from a defaulting seller, when the seller offers to furnish the goods for less than other available sources but at more than the contract price.

■ Also, Nebraska has made liberal application of the rule that any payment of money, on claim of right thereto by the person to whom made, without any compulsion from business or personal duress, and with knowledge of all the facts, constitutes in law a voluntary payment and is not subject to recovery. See e. g., Renfrew v. Willis, 33 Neb. 98, 49 N.W. 1095; Weber v. Kirkendall, 44 Neb. 766, 63 N.W. 35; Karschner v. Latimer, 108 Neb. 32, 187 N.W. 83; Meyer v. Rosenblatt & Son, 119 Neb. 471, 229 N.W. 771; and Kunkel Auto Supply Co. v. Leech, 139 Neb. 516, 298 N.W. 150—upon which the trial court relied.

Consumers' cross-appeal therefore affords no basis for reversal of the trial court's judgment in any respect. But consideration of whether the court properly held as a matter of Nebraska law that the legal effect of Consumers' lack of intention and agreement in fact to supersede or terminate the original contract was to leave it surviving of both the making and the performing of the 1943 arrangement is still necessary in disposing of Cooperative's contentions in its appeal from the damages allowed for the period prior to the making of the arrangement.

As we suggested above, if the making of the arrangement in itself had the effect of so superseding the contract as to rescind it in all its rights—accrued breach as well as executory operation—then of course Consumers was left without basis or right of any nature to sue for breach. And even if the making of the arrangement had only the effect of terminating the executory portion of the contract, the statute of limitations would have been set in operation at that point as to any previous breach, and Consumers' right to damages therefor would in the present situation be barred under the Nebraska statute, as will be later discussed. Again, if the making of the arrangement was not sufficient alone to cause a superseding of the executory obligation of the contract but such making plus the performance thereunder could have had that effect, the point of the superseding or termination would equally be of importance in relation to a commencement of the running of the statute of limitations against the previous breach.

■ The general rule as to when one agreement is to be regarded as having been superseded by another between the same parties was stated by this Court in Housekeeper Publishing Co. v. Swift, 8 Cir., 97 F. 290, 294, in an opinion written by Judge Walter H. Sanborn, as follows: "A subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, supersedes, and is substituted for the earlier contract, and becomes the only agreement of the parties on the subject." As the opinion indicates, such a superseding is a matter of necessary, and therefore implied, legal effect, in that performance of the inconsistent contracts, in the identical field of the parties' relationship, is not possible, and, if any operativeness is to exist, it can only be on the basis of the later contract being treated as having excluded the previous one from the field. Id., 97 F. at page 295. See also 12 Am.Jur., Contracts, § 433, p. 1013.

Nebraska, we think, has expressly recognized this rule of implied superseding or termination from inconsistency, at least as to the executory aspect of such a previous contract. In Price v. Platte Valley Public Power District, 139 Neb. 787, 789, 298 N.W. 746, 748, the court made citation of Housekeeper Publishing Co. v. Swift, supra, and said: "The applicable rule in such circumstances is that a contract complete in itself will be *conclusively* pre-

sumed to supersede another one made prior thereto in relation to the same subject matter." (Emphasis supplied.)

In the Price case, there had been a subsequent contract for a different employment salary than in a previous agreement. At the time the subsequent contract was made, part of the salary due under the previous agreement had not been paid, and the action was one to recover the unpaid balance. The court regarded the subsequent agreement as having terminated the previous agreement executorily and so as having set in operation the statute of limitations as to any right of action existing on the previous contract. It treated the breach of the previous contract, however, as not having been affected by the superseding, saying that the subsequent agreement was made "without any contention then or now that plaintiff was not entitled to pay pro tanto on the first contract."

The trial court in the present situation relied upon three Nebraska decisions, in support of its view that the original fuel-oil contract had in no way been superseded by the subsequent arrangement or by its performance, for want of a mutual intention or agreement in fact that the subsequent arrangement should have that effect. These cases were Uhlig v. Barnum, 43 Neb. 584, 585, 61 N.W. 749; Walsh v. Lunney, 75 Neb. 337, 106 N.W. 447; and In re Estate of Wise, 144 Neb. 273, 13 N.W.2d 146, 148.

In the Uhlig case, the subsequent contract involved was capable of constituting a mere supplement to or modification of the original agreemnet and so of leaving the original agreement operative in its general aspects, and in this situation the court refused to hold that a superseding or termination had occurred as a matter of law but regarded the question as one of intention of the parties on all the circumstances.

In the Walsh case, room similarly existed to regard the subsequent contract as being simply supplemental in its nature and operativeness, and the question whether or not it was intended that the previous agreement should be superseded or rescinded was accordingly held to be for the jury.

In the Wise case, there was an agreement that a note might be discharged in a certain manner but if the agreement was not performed the obligation of the instrument was to be reinstated. The court held that the making of the agreement, on this contingency, had not operated to discharge the note and that default in performance of the agreement clearly left the obligation of the note subject to suit. This would appear to be merely an application of the well-settled principle that, "Where a new contract is consistent with the continuance of the former one and only provides a new mode of discharging the same, it has no effect as a rescission unless or until it is performed." 17 C.J.S., Contracts, § 395, p. 886; also 12 Am.Jur., Contracts, § 433, p. 1013.

These cases do not seem to us to manifest any lack of adherence by the Nebraska Supreme Court to the general rule set out above, that the making of a subsequent agreement, uncontingent in nature, inconsistent with a previous contract between the parties, in the same field of relationship, not constituting a modification of or supplement to the previous contract, and incapable of performance with it, has the legal effect of superseding the previous contract. In such a situation— as the language of the Price case, supra, "conclusively presumed to supersede", can only mean—the intention to supersede is implied as a matter of law.

In situations where the two contracts are so inconsistent in their obligation as legally to require that the one be superseded if a performance is to be possible or to have any effect, the only question that can exist, we think, is as to the nature or scope of the superseding to be recognized. If the superseding should be given the legal effect of a rescission, then all rights under the previous contract would be wiped out, including that of damages for such breach as had occurred before the superseding. On the other hand, if the superseding were to be treated as a termination of the previous contract as to executory operativeness only, equivalently as an abandonment of the contract, then merely the obligation of further performance would be discharged and the

right to damages for injury from past breach would survive.

■ In stating the rule as to implied superseding from inconsistency, the cases generally have used the term "rescission" or "rescind", but ordinarily the technical meaning or effect of the term has not been of significance in the specific situations and the use of the term has been consistent with the sense or consequence of "abandonment." And since such superseding as is held to occur by implied intention in situations of inconsistency is for the legal purpose of leaving a field for operativeness and performance, there would seem to be no sound reason why that superseding, uncontrolled by other circumstances, should be regarded as having any farther reach than is necessary to carry out the purpose for which it is given effect. In other words, absent any other legal element than inconsistency in two contracts, each uncontingently made, with an impossibility of coexistence if natural performance is to occur, it would seem more reasonable to accord the superseding required to be given effect in such a situation simply the sufficient scope of terminating or discharging the previous contract in its executory obligation, than to treat it as plenarily having rescinded or uprooted the contract and left the situation as if it never had been entered into or had any previous operation. Any actual reach beyond the discharge of further performance—i. e. cutting off the previous contract at the point where the subsequent contract legally is capable of taking over and carrying on— should logically have to depend on other or special factors, if they exist in such a situation and are compelling of such a result.

This we believe to be the rule in Nebraska. In addition to the foregoing rationale, such was the scope of the superseding effect recognized by the parties and accepted by the court in the Price case, supra, 139 Neb. 787, 789, 298 N.W. 746. And similarly it constitutes the extent of the superseding effect claimed by Cooperative to exist in the present case from the 1943 arrangement—Cooperative's contention on this aspect being simply that the arrangement had superseded the 1939 contract as to its executory obligation; that the arrangement thereby had cut off the further operativeness of the contract; and that the statute of limitations thus had commenced to run as of that time against any previous breach.

All of this then leads to the question whether the arrangement, in itself or coupled with the parties' actions under it, was required to be regarded legally as amounting to an agreement, and, if so, whether there was such an inconsistency with a previous contract that the arrangement could not have operativeness or effect in the mutually attempted performance of it, unless the contract was superseded by it.

■ The second part of the question does not seem to us to require discussion. Obviously, it would not be legally possible for two obligations, each made without any contingency as to the other, to have natural operativeness for the supplying of fuel oil in the same field of relationship as to time, quantity and purposes, at two different prices.

■ On the first part of the question too —whether the arrangement with the actions of the parties under it gave rise to a contractual relationship so as to be capable of having a superseding effect—we equally think that but little more difficulty can be argued to exist. That Cooperative would have no dealings with Consumers on the basis of the 1939 contract was admitted, and that Consumers was desirous of obtaining its fuel-oil needs from Cooperative on some acceptable basis, in place of having to make its purchases elsewhere, is no less patent on the record.

In these circumstances, the parties, with a total ignoring between them of the previous contract, entered into negotiations and arrived orally at an "understanding" or "arrangement", as it was denominated by the trial court. Then Consumers availed itself of this arrangement to obtain its fuel-oil needs from Cooperative through the balance of the period which the contract had covered and performed the terms of the arrangement in making payment, again

with no indication of being engaged in anything except ordinary good-faith transaction. On these facts, and as a matter of general commercial dealing, an actual intent contemporaneously on the part of Consumers to abandon the contract seems objectively a bit hard to escape, but, as indicated above, we accept the trial court's considered appraisal to the effect that Consumers in fact was "secretly intending all the time to sue the defendant" for the excesses of which it was making payment in apparent regular business manner and course.

We pass therefore to a consideration of whether, apart from Consumers' intention in fact, there was in what the parties did, as a matter of necessary legal effect, a superseding of the contract equivalently as an abandonment.

Following the parties' arrival at an oral "understanding" or "arrangement", Cooperative sent Consumers a letter offering to supply oil for the Sidney and Ogallala plants on the price basis agreed upon in their negotiations, which was to consist of the market "low" of "ordinary industrial gas oil" as of the time of any ordering, plus a fixed differential as to each plant. Since the letter was in the form of a purported offer, it could not, of course, be said to constitute a superseding contract in itself. But when Consumers began ordering under the letter, there inescapably came into existence contractual relationship in transaction inconsistent with the previous contract. This relationship was maintained by Consumers through orders under the arrangement during the remaining period which the contract had covered. Thus, there existed in the situation not merely inconsistent contractual relationship as to all of the period that had remained but full excluding performance of that relationship. And performance made in uncontingent, inconsistent contractual relationship certainly, even more inexorably than alone the making of an agreement, would have to be said to have excluded the operativeness of a previous contract. Cf. McCabe Const. Co. v. Utah Const. Co., D.C.Or., 199 F. 976.

A discharge of all the executory obligation which remained on the 1939 contract from the time the arrangement was made would have to be held to have resulted from what the parties did, if their actions are to be accorded a legal effect. And since the thread of all performance right from May, 1943, on has thus been cut off, there does not exist anything on which a postponement of the statute of limitations as to a previous obligation and breach can be hung beyond that date.

On the breach claimed against Cooperative for the outside purchases which Consumers had had to make prior to May, 1943, Cooperative's liability was, as the trial court held, not one arising from an actual assumption of the contract but one deriving from legal implication or operation of law, in having taken for its own, through distributive liquidation, as sole stockholder, the plant and other assets of the old refinery corporation. The Nebraska statute of limitations as to such an implied liability is four years. Neb.R.S.1943, § 25–206. With the obligation for performance as to the remaining period from May, 1943, on all wiped out, so that nothing has been left under the contract to serve as a bumper against the impact of the statute of limitations, Consumers' commencement of the present action in July, 1947, cannot be said to have been timely, and the court should have denied recovery on the ground that the four-year right was barred.

Consumers has attempted to escape the four-year statute here, and to bring the situation within the five-year statute applicable in Nebraska to written contracts on the basis of execution or assumption, Neb.R.S.1943, § 25–205, by arguing that it should be held that there had been an actual assumption. It relies upon a statement in our opinion in Diamond A Cattle Co. v. Tschirgi, 8 Cir., 181 F.2d 991, 995, to the effect that one who has taken over a corporation's assets, without consideration unless an assumption existed, might be found to have made such an assumption as a matter of fair import and natural intention between the parties, except where

it was compellingly demonstrated that the contrary was the fact.

Loosely read and in isolation, this statement might be subject to misunderstanding, but we do not think it so, when read in the context of what we precedingly and followingly said. We had just previously declared that a finding of assumption was not precluded by the mere absence of specific or direct proof, where the fact itself was a matter of clear implication or reasonable inference from all the circumstances. Thus, we were not holding that we would treat such a taking over of assets as establishing an assumption in fact but only that there was room in such a situation, in the absence of compelling proof to the contrary, for the trial court to make a finding that such an assumption had occurred, where the circumstances were supportive of that factual view. The finding, however, necessarily would have to be one on the part of the trial court and be supportable on the circumstances, before any effect could be claimed for it before us. It should be noted that we pointed out in the Tschirgi case, following the statement relied upon by Consumers here, that we were accepting the trial court's view as to the existence of an assumption in that case, on the basis (1) of the room therefor on the circumstances, (2) of the assignee's failure to make any challenge at the time in the trial court of the sufficiency of the evidence to support such a finding, and (3) of the assignee's own claim of rights by way of asserted counterclaims on the contract alleged to have been assumed.

The conclusion reached above, as to the breach for which Consumers was allowed a recovery being barred by the statute of limitations, may perhaps make unnecessary practicably any consideration of the propriety of the dismissal of Cooperative's third-party complaint against the Carpenters. However, on the merits, if disposition of that question is of any importance, the dismissal would be entitled to be affirmed, as being sufficiently warranted by the elements of estoppel set out by the trial court.

What we have said requires that the denial of recovery to Consumers for the period from May, 1943, on be affirmed; that the dismissal of Cooperative's third-party complaint against the Carpenters also be affirmed; and that the recovery in favor of Consumers for the period from October, 1942, to May, 1943, be reversed.