KANSAS, OKLAHOMA & GULF RAILWAY
COMPANY, a Corporation,
Plaintiff in Error,

v.

GRAND LAKE GRAIN COMPANY, a Corporation, Defendant in Error.

No. 40990.

Supreme Court of Oklahoma.

Sept. 12, 1967.

Rehearing Denied Oct. 10, 1967.

**154**

James D. Gibson, Muskogee, Wallace & Owens, Miami, for plaintiff in error.

Nesbitt & Nesbitt, S. C. Fullerton, III, Miami, for defendant in error.

BERRY, Justice.

Defendant in error, herein called plaintiff, recovered judgment for damages against plaintiff in error, hereafter referred to as defendant or the "Railroad." The action was based upon the alleged breach of an implied contract to furnish shipping facilities over defendant's railroad running from Muskogee, Oklahoma, through Delaware County on the east side of Grand River, to a connection with other lines at Baxter Springs, Kansas. The matters hereafter summarized, so far as necessary to consideration of the issues, adequately disclose the factual background which gave rise to the action culminating in this appeal.

At all pertinent times plaintiff was a domestic corporation engaged in grain processing and storage. Defendant was a common carrier operating a line of railroad which passed through Smallwood Junction in Delaware County, which was approximately 10 miles from any other railroad. Defendant was an interstate carrier, subject to jurisdiction and regulations of the Interstate Commerce Commission.

On March 27, 1957, the parties executed a written lease covering $69/100$ths acre of defendant's right of way in Smallwood Junction. This property was to be utilized by plaintiff as an industrial site for erection and operation of a grain and feed processing and storage facility. This lease originally expired December 1957, but eventually was extended to December 31, 1984, by written agreement. This lease provided:

"6. This lease is granted to the Lessee in consideration and upon the express condition that said lessee shall ship and route over the line of railroad of the carrier and associated lines, all carload freight destined to and from above described premises, providing the freight rates over said line or lines are no higher than over lines by which said freight can be routed, the object of the lease being to facilitate the efficient operation of the railroad of the carrier in the transaction of its business in connection with the business of the lessee."

Plaintiff took possession of the premises and erected the processing and storage plant. Prior to May, 1960, the grain received at plaintiff's plant was shipped principally by truck, only the following shipments being over defendant's railroad: 1957—21 carloads; 1958—20 carloads; 1959 —none. In 1959 plaintiff entered into an agreement to buy grain and feed from Ralston-Purina Company in Muskogee, and to pay 90¢ per ton freight charge to this supplier for all carload shipments over defendant's line. Beginning in May, 1960, plaintiff received shipments over defendant's railroad: 1960—16 carloads; 1961—55 carloads; 1962—73 carloads.

On December 19, 1961, defendant was advised the construction site of Markham's Ferry Dam on Grand River would be over defendant's tracks, and the reservoir to be impounded would innundate approximately 19 miles of track and right of way north of the dam. Construction and innundation would result in the segment between the southerly approach to the dam and Okay, Oklahoma, becoming a useless spur. To the north of the reservoir there would be a disconnected segment approximately 50 miles long running to Baxter Springs, Kansas. Grand River Dam Authority, hereafter the "Authority" required possession of the area to be innundated in order to complete construction of the project in time. This was necessary because in the event construction was not completed by May 1, 1964, the Authority would lose a substantial sum as the result of inability to fulfill certain contracts for sale of surplus electric power. Engineering estimates fixed costs of relocating the railroad on the west side of Grand River at $3,200,000.00, while costs on relocation on the mountainous, east side would amount to $8,000,000.00.

The Missouri-Kansas-Texas Railroad Company filed suit in the United States Federal Court, seeking to enjoin the proposed western relocation, which would have been in the area of its own line, and defendant was restrained temporarily from proceeding further. Failing in its efforts to induce the two railroads to compose their differences, the Authority authorized filing of condemnation proceedings against defendant's property, unless defendant agreed to the offer for relocation of the road. On the day set for trial of the injunction suit defendant agreed to accept $3,100,000.00 in settlement of all damages resulting from taking the 19 miles of railroad. As part of this agreement defendant also agreed to apply to the Interstate Commerce Commission for permission to abandon the line serving Smallwood Junction.

Defendant filed application seeking Interstate Commerce Commission permission for abandonment of the line serving Smallwood Junction. The application was protested by other railroads, the Oklahoma Corporation Commission, the Governor of Oklahoma, various labor organizations, and the plaintiff who appeared and testified in opposition to the application.

The Interstate Commerce Commission heard the case, and found that public convenience and necessity permitted defendant's abandonment of the line of railroad involved, subject to conditions and exceptions not material to issues presently involved. The order found that abandonment was justified by reason of impossibility of operation of the line as located because of innundation. Further, relocation west of the reservoir had been the subject of injunction proceedings in the Federal Court, and attempted relocation east of the reservoir would be "totally impractical because of semi-mountainous terrain * * ." Pursuant to authorization defendant abandoned operations after the order was final (December 27, 1962) and removed its track. As a result plaintiff was unable to ship feed and grain, except by truck freight at a cost of $3.50 per ton.

Plaintiff's petition alleged the facts of the parties' relationship, execution and extension of the lease and plaintiff's business operations in reliance thereon; under the quoted provision, defendant impliedly agreed to transport carload for plaintiff during the term of the lease; plaintiff's business was

well established and this would have continued for the entire lease had defendant not ceased operations, thus leaving plaintiff without railroad transportation facilities; by reason of breach of the agreement plaintiff was required to ship by truck at an additional cost of $3,900.00 per year. Plaintiff asked judgment for $85,000.00 as damages for the remaining 22 years of the lease.

After demurrer was overruled defendant answered admitting execution and extension of the lease but denying any implied agreement to maintain the railroad for plaintiff for the lease term, or any other time. The answer also alleged invalidity of the lease as being violative of Federal law; and also because an agreement to operate a railroad for a term of years was violative of 49 U.S.C.A. § 1 et seq. (Part 1, Interstate Commerce Commission Act). Further, any implied agreement was terminated when the Authority, vested with power of eminent domain, took part of defendant's railroad under threat of eminent domain and defendant being without defense to such appropriation was forced to negotiate in order to secure fair compensation for its property; because of authorized abandonment and severance of its railroad it was impossible to comply with alleged implied contract, but if any implied agreement existed there was a coexisting implied condition of the railroad's continued existence. The pleadings were amended in certain respects not here material, the controlling issues arising from the matters above mentioned.

The jury found the issues in plaintiff's favor and fixed $15,000.00 as the amount of damages. In the appeal from the judgment entered upon this verdict defendant has assigned 41 specifications of error which are the basis of seven contentions. Both parties have presented their case by substantial briefs. Contentions advanced by defendant and subjected to counter-arguments by plaintiff, involve questions relative to asserted illegality of the alleged implied contract; the force and effect of the Interstate Commerce Commission order;

whether plaintiff's shipments were intrastate or interstate, and errors arising from exclusion of certain evidence and the giving of certain instructions. Because we are of the opinion the case properly is determinable upon the issue relative to impossibility of performance of any implied contract, consideration of such other matters is unnecessary.

Defendant's contention was, and is, that if there was an implied agreement the railroad would continue operations between Muskogee and Smallwood Junction, such agreement became unenforceable upon authorized abandonment of the line, which rendered the agreement impossible of performance. The contention, and the supporting argument, are derived from what is denominated the modern rule: that nonperformance of a contract may be excused if literal performance becomes impractical or impossible due to nonexistence of something essential to the contract.

As respects this issue plaintiff's argument may be summarized in this manner: The lease contract was executed by defendant despite knowledge of plans for construction. When the Authority ascertained the necessity for taking part of defendant's property it offered to relocate the road to the west of Grand River, although relocation on the east side of the river was possible even though more expensive. The offer to make the western relocation was attacked by injunction proceedings. Without trying the issues in that case, and without requiring the Authority to file condemnation proceedings, defendant made a settlement offer by the terms of which a lesser amount was accepted than the western relocation would have cost. Thereafter defendant voluntarily applied for and was granted permission to abandon this line which adversely affected plaintiff's business.

Under the summarized analysis plaintiff urges that: (1) defendant cannot claim impossibility of performance since by its own acts defendant created a condition which rendered the contract impossible of performance; (2) that merely because per-

formance, i. e. eastern relocation of the railroad in the semi-mountainous area, was impractical, this cannot be extended to mean impossibility of performance.

As respects the first argument plaintiff relies upon the rule that a party who prevents performance of any condition in a contract can neither claim benefit nor escape liability upon failure of the condition. Mount v. Schulte, 193 Okl. 335, 143 P.2d 424. In order to apply such rule to the present case it is necessary first to accept plaintiff's conclusion, or assumption, that defendant's own acts were the primary cause of discontinuance of railroad service.

Plaintiff does not contend defendant could have prevented the Authority from taking its property, or that litigation in the Federal Court would have resulted in permitting western relocation of the railroad. However, it is asserted that defendant's voluntary settlement with the Authority for the property taken, coupled with defendant's application to the Interstate Commerce Commission for permission to abandon railroad service, were acts by which defendant rendered the contract impossible of performance. Reduced to simplest terms, this argument amounts to a charge that, by deliberate act, defendant took advantage of existing circumstances to evolve a scheme for evading contractual liability to plaintiff. Obviously no litigation could have prevented the Authority from condemning the property taken. Success of litigation seeking to force western relocation of the railroad would have been most highly speculative, while necessarily creating a hiatus in defendant's operations and relationship with plaintiff. The established rule that compromises are favored by the law would be destroyed by according recognition of the claim that defendant's own acts created the condition which rendered the contract impossible of performance.

The second phase of argument is that although possible eastern relocation of the railroad was "totally impractical", this did not establish impossibility of performance of the contract. Although supported by other case authority, plaintiff's argument is based upon the text rule in 17A C.J.S. Contracts § 461, which states the distinction between natural impossibility preventing performance, and impossibility in fact in the absence of inherent impossibility in the nature of the thing contracted to be performed. Natural impossibility goes to the consideration and renders the contract void. Upon this premise plaintiff classifies Cosden Oil & Gas Co. v. Moss, 131 Okl. 49, 267 P. 855, as a case of natural impossibility, and urges the reasoning and result in Clements v. Jackson County Oil & Gas Co., 61 Okl. 247, 161 P. 216, L.R.A. 1917C, 437, as here controlling. The syllabus rule in Clements states that, in order to bring a contract within the rule of impossibility of performance, it must appear the thing to be done cannot be accomplished by any means. Examination of that case reflects that the asserted impossibility of performance resulted from financial inability of the party to perform the contract, and not from conditions involving the nature of the thing to be performed.

Plaintiff's argument fails to recognize controlling exceptions which most courts, including this jurisdiction, have applied to the harsh common law rule denying any right to dispensation. The principle, although not of recent origin, has become a settled feature of the modern law of contracts, and has been denominated the doctrine of supervening impossibility. In 17A C.J.S. Contracts § 464, the rule is stated:

"Where, from the nature of the contract, it is evident that the parties contracted on the basis of the continued existence of the person, thing, condition, or state of things, or of facts, to which it relates, the subsequent perishing of the person or thing, or cessation of existence of the condition or state will excuse the performance, or terminate the contract, a condition to that effect being implied, in spite of the fact that the promise may have been unqualified. The rule has been limited to the situation where neither party is at fault and neither has

assumed the risk. It has been referred to as the doctrine of supervening impossibility of performance."

In 6 Williston, Contracts (rev. ed.) § 1946, the rule is stated:

"It is now well settled that where the existence of a specific thing is necessary for the performance of a contract, the accidental destruction or nonexistence of that thing excuses the promisor, unless he has assumed by his contract the risk of its existence."

Dealing with the subject of impossibility of performance of contracts A.L.I., Restatement of The Law Of Contracts, V. II, Chap. 14, §§ 454, 457, state:

"In the Restatement of this Subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."

"Except * * * where, after the formation of a contract facts that a promisor had no reason to anticipate, and for the occurrence of which he is not in contributing fault, render performance of the promise impossible, the duty of the promisor is discharged, unless a contrary intention has been manifested, even though he has already committed a breach by anticipatory repudiation; but where such facts occur after the time when performance of a promise is due, they do not discharge a duty to make compensation for a breach of contract."

■ In 84 A.L.R.2d § 18 et seq. there is an extended annotation dealing with the question of impossibility of performance as a defense in actions for damages for breach of contract. It is there pointed out that the more modern rule of supervening impossibility means not only actual strict impossibility, but impracticability arising from extreme and unreasonable difficulty, loss injury or expense which may be involved. Some jurisdictions place the exception upon the basis of an implied condition, in that the contract involved was based upon an assumed, continued existence of a particular thing essential to performance. See Texas Company v. Hogarth Shipping Co., 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123; also see Straus v. Kazemekas, 100 Conn. 581, 124 A. 234, enumerating four separate, implied conditions which may excuse nonperformance; Dorsey v. Oregon Motor Stages, 183 Or. 494, 194 P.2d 967.

In Texas Company, supra, the basis of the rule was stated to be that where parties contract upon the assumption something essential to the performance will continue to exist and be available for that purpose, neither party having agreed to be responsible for continued existence thereof, the contract is considered subject to an implied condition that if before time for performance and absent default of either party, the particular thing involved ceases to exist, or to be available for the purpose for which the parties contracted, the contract is treated as dissolved and nonperformance is excused.

The annotation, p. 56, cites Cosden Oil and Gas Co. v. Moss, 131 Okl. 49, 267 P. 855, as recognizing the principle. Syllabus 1 therein states:

"Where it is apparent that a contract was entered into on the basis of the existence of something essential to its execution, there is the implied condition of the contract that if literal performance becomes impracticable or impossible by reason of the nonexistence of the essential thing, to the extent of nonexistence performance will be excused, and in such circumstances the terms 'impracticable' and 'impossible' are of equal legal effect."

■ Plaintiff urges inapplicability of the rule in Cosden, supra, because that case involved a case of "natural impossibility of performance." However, in our later decision of Tulsa Opera House Co. v. Mitchell, 165 Okl. 61, 24 P.2d 997, the Court reviewed numerous decisions from other jurisdictions, and adopted the reasoning in Texas Company, supra, in the first syllabus:

"Where parties enter into a contract on the assumption that some particular thing

essential to its performance will continue to exist and be available for the purpose, and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist and be available for the purpose, the contract shall be dissolved and the parties excused from performing it."

■ We are of the opinion this reasoning and the rule based thereon conclude the issue here presented. The contract having been drafted by defendant, plaintiff urges that it is to be implied that defendant was obligated to maintain rail service until December 1984. The contract did not contain either an express provision for maintenance of service for a fixed term, or a provision for cessation of service. Should it be implied from the contract that service was to be furnished until the termination date (December, 1984) it would necessarily have to be implied that impossibility or impracticability of maintaining rail service would relieve the defendant from further obligation. The contract here considered, under the rule of the cited cases, was subject to an implied condition that, absent default of either party, if the railroad ceased to exist or become unavailable for furnishing railroad service the contract should be dissolved and nonperformance excused.

During court of the trial the court refused to admit any evidence offered by defendant relative to impracticability and unfeasibility of any attempt to effect an eastern relocation of the railroad. The trial court's position was that defendant, having pleaded impossibility of performance of the contract, was limited to evidence tending to establish physical impossibility of relocation of the line of railroad along the east side of the reservoir. In the same connection, the trial court also refused all defendant's tendered instructions bearing upon the issue of impracticability of per-

formance resulting from abandonment of the railroad.

In the instructions given the jury was advised that an implied contract existed between plaintiff and defendant as a matter of law, under which defendant had agreed to ship all freight to and from plaintiff's plant. And, the court further instructed the jury that:

"You are instructed that an order of public convenience and necessity made by the Interstate Commerce Commission giving defendant permission to abandon its railroad through Delaware County, Oklahoma is no defense to Plaintiff's action herein for damages for breach of an implied contract to ship freight over said railroad."

"You are instructed that to bring the case within the rule of impossibility of performance it must appear that the thing to be done cannot, by any means be accomplished, for if it be only improbable or out of the power of the obligor it is not deemed in law as impossible.

"You are therefore instructed that if you find from the evidence that if defendant impliedly contracted to ship and route in and out of the Grandlake Company's plant, the defendant company must perform its part of the contract or pay plaintiff damages for not doing so, and, in that event your verdict should be for plaintiff."

Since the trial court refused to allow defendant to introduce any evidence bearing upon impracticability of relocation of the railroad, these instructions coupled with instructions advising the jury that an implied contract to furnish freight service to plaintiff existed, and that the order allowing abandonment of the railroad was no defense to an action for damages for breach of such contract, amounted to an instructed verdict for the plaintiff.

Without consideration of errors predicated upon exclusion of proffered testimony, or resulting from the refusal of requested instructions, it is clear the trial

court erred as a matter of law by failing to recognize and apply the controlling rules of law announced in Cosden Oil and Gas Company and Tulsa Opera House Company, supra.

The judgment is reversed and the cause is remanded to the trial court to vacate the judgment entered and grant defendant a new trial.

All Justices concur.