NORTHERN CORPORATION, Appellant,

v.

CHUGACH ELECTRIC ASSOCIATION, Appellee.

CHUGACH ELECTRIC ASSOCIATION, Cross-Appellant,

v.

NORTHERN CORPORATION, Cross-Appellee.

Nos. 1758, 1768.

Supreme Court of Alaska.

Jan. 16, 1974.

---

37. Proudfoot, "The Tar Baby": Maritime Personal-Injury Indemnity Actions, 20 Stan.L.Rev. 423, 445 (1968).

Donna C. Willard, of Walton & Willard, Anchorage, Bruce T. Rinker, of DeGarmo, Leedy, Oles & Morrison, Seattle, Wash., for appellant and cross-appellee.

Sanford M. Gibbs, of Hagans, Smith & Brown, Anchorage, for appellee and cross-appellant.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

BOOCHEVER, Justice.

We are here presented with issues concerning the alleged impossibility of performing a public contract. Northern Corporation (hereafter referred to as Northern), appellant and cross-appellee, entered into a contract with Chugach Electric Association (hereafter Chugach), appellee and cross-appellant, on August 3, 1966 for the repair and protection of the upstream face of the Cooper Lake Dam. The contract was awarded to Northern on the basis of its low bid in the sum of $63,655.

The work to be performed was described as follows:

It is required that the upstream face of Cooper Lake Dam be regraded and riprap and filter layer stone quarried, hauled and placed on the upstream face and all other appurtenant work accomplished as required, all in accordance with these plans and specification [sic]. There are about 1750 cubic yards of fil-

ter material and 3950 cubic yards of rip-rap to be placed. The Contractor shall furnish all labor, equipment, materials, etc. required for this project.

The contract called for completion of the work within 60 days of notice to proceed, which was given on August 29, 1966.

The major expense in performing the contract was to be the procurement and placing of riprap. The bidders on the contract were advised with respect to quarry areas from which rock could be obtained:

A quarry area, with suitable rock outcropping on the stream bank, has been located approximately 2500 feet downstream from the dam. A haul road will have to be constructed, either down the stream bed or along the left bank. The quarry area is shown on the vicinity map.

.    .    .    .    .    .

The Contractor may, at his option, select a quarry different from the site shown on the drawings. In this event, the Contractor shall pay the costs of all tests required to verify the suitability of the rock for this project.

Northern first discovered boulders in the stream bed which would be more economical than the designated quarry and received permission to use this source. According to Northern, approximately 20 percent of the contract requirements were fulfilled before Northern exhausted the supply located in the stream bed. Then in the first week of September, Northern moved to the designated quarry site and commenced shooting rock. On September 19, 1966, Northern wrote to Chugach informing them that the rock in the designated quarry was unusable, but was directed in a letter the following day from Chugach's engineering firm to proceed with further blasting and exploration of the designated areas. By September 27, however, Chugach conceded that suitable rock was not available at the designated site and reformed the agreement accordingly.

Alternate quarry sites were found at the opposite end of the lake from the dam. As a result of negotiations, Chugach wrote to Northern on September 27, 1966 authorizing completion of the contract by use of these alternate quarry sites. The authorization provided for amendments to reflect the circumstance that suitable rock was not available in the stream bed for mining, nor in the quarry which had been designated in the original contract documents. Paragraph 3 of the letter of authorization specified:

Rock will be quarried in suitable sizes and quantities to complete the project and will be stockpiled in or near the quarry, or quarries, mentioned above for transport across Cooper Lake to the dam site when such lake is frozen to a sufficient depth to permit heavy vehicle traffic thereon."

The contract price was increased by $42,000. Subsequently, the contract was formally amended in accordance with the September 27, 1966 authorization. Work commenced in the new quarry in October 1966; and within about 30 days, all of the required rock was drilled and shot.

Although there is some question as to who first suggested it or how it came about, it was the agreement of the parties that the rock from the new quarry site would be transported in winter across the ice of Cooper Lake. In December 1966, Northern cleared a road on the ice to permit deeper freezing of the ice. By the time the ice was thought to be sufficiently thick to begin hauling, however, a water overflow on the ice one to two feet in depth prohibited crossings by the trucks. Northern complained to Chugach of unsafe conditions on the lake ice, but Chugach insisted on performance. In March 1967, one of Northern's Euclid loaders went through the ice and sank, and a small crawler tractor subsequently broke through but was recovered. Neither incident involved loss of life. Despite these occurrences, Chugach and its engineering firm continued to insist on performance, threatening default. On March 27, 1967, Chugach again threatened to consider North-

ern in default unless they immediately commenced hauling operations. Northern attempted to commence operations but continued to meet with difficulties, finally ceasing operations on March 31, 1967, apparently with the approval of Chugach.

On January 8, 1968, Chugach advised Northern that it would consider Northern in default unless all rock was hauled by April 1, 1968. On January 20, Northern informed Chugach that they were returning to Cooper Lake, and wrote on January 30 that they anticipated favorable conditions to start hauling rock on January 31. The ice conditions were apparently different from those encountered in 1967—there was very little snow cover and no overflow problem. The ice varied from 23½ inches to 30 inches thick, and for several days the temperature had been 30 degrees below zero and clear.

On February 1, 1968, Northern started hauling with half-loaded trucks; but within the first few hours, two trucks with their drivers broke through the ice, resulting in the death of the drivers and loss of the trucks. Northern at this point ceased operations; and on February 16, 1968, informed Chugach that it would make no more attempts to haul rock across the lake. On March 28, 1968, Northern advised Chugach that it considered the contract terminated for impossibility of performance.

Northern commenced legal action against Chugach in September 1968, seeking recovery for costs incurred in attempted completion of the contract less revenues received. The case was tried in superior court without a jury in December 1971. Northern contended that in the original contract there were express and implied warranties that the designated quarry contained sufficient quantities of suitable rock for the job, and that breach of the warranties entitled Northern to damages. In the alternative, Northern argued that the modified contract was impossible of performance, justifying an award to Northern of reasonable costs incurred in attempted perform-

ance. Chugach counterclaimed, contending that it overpaid Northern for work performed under the contract, and that it was entitled to liquidated damages for the period between the date of completion specified in the amended contract and the date of its termination by Northern. The superior court discharged the parties from the contract on the ground of impossibility of performance, but denied both parties' claims for damages and attorney's fees. From that decision, Northern appeals and Chugach cross-appeals.

The issues on this appeal may be summarized as follows:

1. Is Northern entitled to damages for breach of alleged express and implied warranties contained in the original contract pertaining to available quantities of rock?

2. In the alternative, was the contract as modified impossible of performance?

3. If the modified contract was impossible of performance, is Northern entitled to reasonable costs incurred in endeavoring to perform it?

4. Is Chugach entitled to liquidated damages for delays in performance of the contract, and to costs and attorney's fees?[1]

Our analysis of the events preceding the lawsuit leads us to the conclusion that the dispositive issues pertain to the question of impossibility of performance. It appears clear to us that the original agreement between Chugach and Northern was superseded as a result of Chugach's letter to Northern, dated September 27, 1966, and the subsequent formal amendment of the contract in accordance therewith. The amendment recognized that the quarries originally specified did not provide a sufficient quantity of riprap. The original contract price of $63,655 was increased by $42,000 to cover the additional costs incurred and to be incurred by Northern in exploration of the quarry originally desig-

---

I. Chugach's contention that it overpaid Northern has apparently been abandoned on appeal.

nated, in securing rock at the redesignated quarries, in hauling the rock to the dam site, in stockpiling it, and in cleaning up the redesignated quarry areas. The amendment was executed by both parties to the contract. Since the amendment provided for the additional costs incurred by Northern as a result of the absence of a suitable rock supply at the quarry originally designated, we need not concern ourselves with whether express or implied warranties were breached with reference to the quantity of rock available at the originally designated quarry.[2] There is no contention here that the amended contract did not designate quarries containing suitable quantities of rock.

## IMPOSSIBILITY

■ The focal question is whether the amended contract was impossible of performance. The September 27, 1966 directive specified that the rock was to be transported "across Cooper Lake to the dam site when such lake is frozen to a sufficient depth to permit heavy vehicle traffic thereon," and the formal amendment specified that the hauling to the dam site would be done during the winter of 1966–67. It is therefore clear that the parties contemplated that the rock would be transported across the frozen lake by truck. Northern's repeated efforts to perform the contract by this method during the winter

of 1966–67 and subsequently in February 1968, culminating in the tragic loss of life, abundantly support the trial court's finding that the contract was impossible of performance by this method.

■ Chugach contends, however, that Northern was nevertheless bound to perform, and that it could have used means other than hauling by truck across the ice to transport the rock. The answer to Chugach's contention is that, as the trial court found, the parties contemplated that the rock would be hauled by truck once the ice froze to a sufficient depth to support the weight of the vehicles. The specification of this particular method of performance presupposed the existence of ice frozen to the requisite depth. Since this expectation of the parties was never fulfilled, and since the provisions relating to the means of performance was clearly material,[3] Northern's duty to perform was discharged by reason of impossibility.[4]

There is an additional reason for our holding that Northern's duty to perform was discharged because of impossibility. It is true that in order for a defendant to prevail under the original common law doctrine of impossibility, he had to show that no one else could have performed the contract.[5] However, this harsh rule has gradually been eroded, and the Restatement of Contracts[6] has departed from the early

---

2. *See* Cooperative Refinery Ass'n v. Consumers Public Power Dist., 190 F.2d 852, 856–857 (8th Cir. 1951); Johnson v. Mosley, 179 F. 2d 573, 588 (8th Cir. 1950); In re Swindle, 188 F.Supp. 601, 604 (D.Or.1960).

3. The initial contract price was $63,655. Performing by the alternative method (barging) would have cost an additional $59,520.

4. Restatement of Contracts § 460 (1932) provides in pertinent part:

   Where the existence of a specific thing . . . is, either by the terms of a bargain or in the contemplation of both parties, necessary for the performance of a promise in the bargain, a duty to perform the promise . . . is discharged if the thing . . . subsequently is not in existence in time for seasonable performance. . . .

In accord with this rule is Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 629–630, 41 S.Ct. 612, 65 L.Ed. 1123, 1130 (1921); Parrish v. Stratton Cripple Creek Min. & Development Co., 116 F.2d 207 (10th Cir. 1940), cert. denied, 312 U.S. 698, 61 S.Ct. 738, 85 L.Ed. 1132 (1941); *see especially* Kansas, Oklahoma & Gulf Railway Co. v. Grand Lake Grain Co., 434 P.2d 153 (Okl.1967). Discharge of a party for impossibility of performance abates the severity of the old common law doctrine that not even objective impossibility excused performance; *see* Annot., 84 A.L.R.2d 12, 22 (1962).

5. *See generally* 84 A.L.R.2d at 35–36.

6. Restatement of Contracts § 454 (1932) states:

   Definition of Impossibility.

   In the Restatement of this Subject impossibility means not only strict impossibili-

common law rule by recognizing the principle of "commerical impracticability". Under this doctrine, a party is discharged from his contract obligations, even if it is technically possible to perform them, if the costs of performance would be so disproportionate to that reasonably contemplated by the parties as to make the contract totally impractical in a commercial sense.[7] This principle was explicated in Natus Corp. v. United States,[8] where the Court of Claims, although holding that the defense was not justified on the facts of that case, went on to explain:

> In taking this position, we readily concede that the doctrine of legal impossibility does not demand a showing of actual or literal impossibility.

> Removed from the strictures of the common law, "impossibility" in its modern context has become a coat of many colors, including among its hues the point argued here—namely, impossibility predicated upon "commercial impracticability." This concept—which finds expression both in case law . . . and in other authorities . . . is grounded upon the assumption that in legal contemplation something is impracticable when it can only be done at an excessive and un-

reasonable cost. As stated in Transatlantic Financing Corp. v. United States . . . :

> . . . The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance . . . [citations omitted].[9]

Sec. 465 of the Restatement also provides that a serious risk to life or health will excuse nonperformance.[10]

■ Alaska has adopted the Restatement doctrine whereby commercial impracticability may under certain circumstances justify regarding a contract as impossible to perform. In Merl F. Thomas Sons, Inc. v. State,[11] this court was confronted with an appeal from a grant of summary judgment against a contractor or who alleged in defense of nonperformance that the contemplated means of performing a clearing contract was to move equipment across the ice on the Susitna River from Talkeetna to the job site. Due to thin ice, this means of performance was impossible. Despite the

---

ty but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.

7. For example, one California case applied this result where it was about ten times as expensive to perform as was contemplated by the parties. Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 P. 458 (1916).

8. 371 F.2d 450, 178 Ct.Cl. 1 (1967).

9. *Id.* at 456. *See also* Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966).

10. Restatement of Contracts § 465 states: When Apprehension of Impossibility Excuses Beginning or Continuing Performance.
(1) Where a promisor apprehends before or during the time for performance of a promise in a bargain that there will be such impossibility of performance as would discharge or suspend a duty under the promise or that performance will seriously jeopardize

his own life or health or that of others, he is not liable, unless a contrary intention is manifested or he is guilty of contributing fault, for failing to begin or to continue performance, while such apprehension exists, if the failure to begin or to continue performance is reasonable.
(2) In determining whether a promisor's failure to begin or to continue performance is reasonable under the rule stated in Subsection (1), consideration is given to
(a) the degree of probability, apparent from what he knows or has reason to know, not only of such impossibility but of physical or pecuniary harm or loss to himself or to others if he begins or continues performance, and
(b) the extent of physical or pecuniary harm or loss to himself or to others likely to be incurred by attempting performance as compared with the amount of harmful consequences likely to be caused to the promisee by non-performance.

11. 396 P.2d 76 (Alaska 1964).

state's contention that the equipment could be transported across the ice at Hurricane, some 70 miles to the north, we reversed the grant of summary judgment, holding that the contractor's allegation that all parties contemplated that equipment would be moved across the ice at Talkeetna raised a question of fact material to the defense of impossibility of performance. We quoted with approval Professor Williston's analysis of the concept of impossibility:

> The true distinction is not between difficulty and impossibility. As has been seen, a man may contract to do what is impossible, as well as what is difficult. The important question is whether an unanticipated circumstance, the risk of which should not fairly be thrown upon the promisor, has made performance of the promise vitally different from what was reasonably to be expected (footnote omitted).[12]

In the case before us the detailed opinion of the trial court clearly indicates that the appropriate standard was followed. There is ample evidence to support its findings that "[t]he ice haul method of transporting riprap ultimately selected was within the contemplation of the parties and was part of the basis of the agreement which ultimately resulted in amendment No. 1 in October 1966," and that that method was not commercially feasible within the financial parameters of the contract. We affirm the court's conclusion that the contract was impossible of performance.[13]

### DAMAGES

The court below found that the decision to utilize the alternate riprap source and the ice haul method of transporting it "was the joint decision of the parties reached in arm's length bargaining and was mutually agreed." Because adequate evidence supports that finding, the cases appellant cites permitting a contractor to recover under an implied warranty of specifications theory are not applicable. Since Chugach did not unilaterally specify the ice haul method, it no more warranted that method than did Northern.

Commencing in February 1967, Northern both orally and by letter began to question the feasibility of the ice haul method. On March 16, it advised of the loss of its Euclid loader, and suggested that an alternate method of hauling the rock be considered and the contract modified. Northern requested authority to demobilize its equipment so as to reduce continuing rental costs. On March 21, 1967, Northern asked to be released from responsibility for loss of life or equipment if an attempt was to be made to haul rock across the lake. On March 22, 1967, it stated:

> We cannot morally require any employee of ours or of our subcontractor's [sic] to operate equipment on the ice any longer this spring. We feel extremely fortunate that we did not lose a life when we lost the L–30 Loader. . . . We are ready to negotiate an alternate method of hauling the rock . . . .

Subsequently, an additional letter was sent, emphasizing in detail the impossibility of hauling rock across the ice.

Despite Northern's verbal and written protestations, Chugach implacably insisted on performance of the contract as agreed upon. Repeated demands by Chugach culminated in a January 1968 letter threatening to declare Northern in default, and to take such further steps against its surety as might be necessary, unless all rock was hauled by April 1. As a result, the final, and ultimately fatal, effort was undertaken in February.

It is Northern's contention that if it is not entitled to recover under an implied

---

12. *Id.* at 79, quoting from 6 Williston, Contracts § 1963 at 5511 (rev. ed. 1938).

13. Affirmance of this holding disposes of Chugach's contention that it was entitled to liquidated damages for delay. Only if the contract were held to be possible to perform could a right to damages for delay arise, for otherwise the legal duty to perform would be discharged.

warranty theory, it should be awarded compensation under the so-called "changes" clause of the contract. Under that clause, Chugach reserved the right to make changes in the contract plans and specifications; but if the cost of the project to Northern was increased as a result of the modification, the contract price would be increased by an amount equal to the reasonable cost thereof.[14]

Under comparable clauses in government contracts, contractors have been awarded their additional costs in endeavoring to meet faulty specifications that were impossible to comply with, even when such costs were incurred prior to a negotiated modification. For example, in Hol-Gar Mfg. Corp. v. United States [15] the Government solicited proposals for the manufacture and delivery of electric generator sets in accordance with an elaborate set of specifications drafted by the Air Force Air Research and Development Command. On the basis of Hol-Gar's proposal, a fixed-price contract was negotiated. Upon testing, pre-production samples were found not to comply with the Government specifications. At subsequent meetings, Hol-Gar's representative stated that they did not believe that the engine which they had selected could meet the Government's perform-

ance requirements, and that the specifications should be changed to permit a substituted engine. The contract was then amended, relaxing the size and weight limitations in the existing specifications. Hol-Gar submitted a claim for costs incurred in trying to perform within the requirements of the original specifications. It had initially been agreed that if, as a result of testing, changes in the specifications were required, such changes were to be processed in accordance with the "changes" clause of the contract (which was very similar to the "changes" clause of the Chugach contract). The court held:

Since the necessity for the change was not due to plaintiff's fault, but to faulty specifications, an equitable adjustment requires that plaintiff be paid the increase in its costs over what they would have been had no change been required.

The Armed Services Board of Contract Appeals has recognized the correctness of the allowance of costs incident to an attempt to comply with defective specifications. See, e. g., J. W. Hurst & Son Awnings, Inc., 59–1 BCA ¶ 2095 at 8965 (1959), where the Board stated:

. . . Where, as here, the change is necessitated by defective specifications

14. Art. I, sec. 2, of the Chugach-Northern contract specifies:
Changes in Construction. The Owner, acting through the Engineer and with the approval of the Administrator, may from time to time during the progress of the construction of the Project, make such changes, additions to or subtractions from the Plans and Specifications which are part of the Proposal as conditions may warrant; provided, however, that if substantial change in the construction to be done shall require an extension of time, a reasonable extension will be granted if the Bidder shall make a written request therefor to the Owner within ten days after any such change is made. If the cost of the Project to the Bidder to make the change shall be increased or decreased, the contract price shall be amended by an amount equal to the reasonable cost thereof in accordance with a construction contract amendment signed by the Owner and the Bidder and approved by the Administrator, but no claim for

additional compensation for any such change or addition will be considered unless the Bidder shall have made a written request therefor to the Owner prior to the commencement of work in connection with such change or addition. The reasonable cost of any increase or decrease in the contract price covered by contract amendment as outlined above, in the absence of other mutual agreement, shall be computed on the basis of the direct cost of materials, f. o. b. the site of the Project, plus the direct cost of labor necessary to incorporate such materials into the Project (including actual cost of payroll taxes and insurance, not to exceed ten percent of payroll cost of labor), plus fifteen percent of the direct cost of materials and labor. Labor cost shall be limited to the direct costs for workmen and foremen. Costs for Bidder's main office overhead, job office overhead and superintendence shall not be included.

15. 360 F.2d 634, 175 Ct.Cl. 518 (1966).

and drawings, the equitable adjustment to which a contractor is entitled must, if it is to be equitable, i. e., fair and just, include the costs which it incurred in attempting to perform in accordance with the defective specifications and drawings. Under these circumstances the equitable adjustment may not be limited to costs incurred subsequent to the issuance of the change orders [citations omitted].[16]

In Maxwell Dynamometer Co. v. United States,[17] the Court of Claims, relying on *Hol-Gar,* also found that the plaintiff was entitled to recover increased costs and expenses which were incurred in attempting to comply with a specification requirement that was impossible to meet.[18]

Closely analogous to the Chugach situation is the decision of the Armed Services Board of Contract Appeals in *Landsverk Electrometer Co.*[19] A manufacturer of dosimeters entered into a contract, thinking that an electrical leakage requirement could be met; but recognizing that it would be necessary for him to "stretch the state of the art" to comply. When, after vain attempts, the contractor advised the Government that it could not meet the specification, the Government relaxed the specification. Although it was held that the contractor was not entitled to extra compensation for the work performed in attempting to meet the specifications before notification to the Government, because the parties had contemplated the necessity of substantial research efforts to meet the required specifications and the contractor had not expended substantially more effort to that end than it was reason-

able to anticipate, the Board went on to state:

There was here no insistence by the Government that the contractor perform, or continue to try to perform, in the face of the contractor's protests that performance was impossible and it should be relieved of its obligation to meet that portion of the specification. On the contrary, within two hours of the appellant's telling the Government that it had become convinced that it simply was unable to perform to the upgraded specification, the Government relaxed the specification and permitted performance at the old, lower level. Had the Government, after it had, or should have, become aware that performance could not be achieved, continued to direct further efforts by a contractor, that direction would certainly constitute a compensable change in the contract, the understanding of the parties [sic].[20]

Unlike the Government in the *Landsverk* case, Chugach continued to demand performance, and we hold that its insistence after it was, or should have been, aware that performance could not be accomplished by the ice haul method constituted, in effect, a compensable change in the contract. Notions of equity and fairness compel this result. If liability for increased costs under the "changes" clause of Government contracts has been predicated on the defectiveness of Government specifications, of which the Government has no actual knowledge, then surely one must hold Chugach liable here, for it had been informed not once but repeatedly that the contract was impossible of performance by the ice haul method.

16. *Id.* at 638. The court additionally based its decision on a finding of breach of implied warranty of the specifications. Judge Davis in concurring, however, evaluated the record as indicating that neither party warranted the specifications, a situation analogous to that of Chugach and Northern.

17. 386 F.2d 855, 181 Ct.Cl. 607 (1967).

18. *See also* Bell v. United States, 404 F.2d 975, 186 Ct.Cl. 189 (1968); Jack Heller, Inc., 72–1 BCA ¶ 9341 (ASBCA 1972).

19. 67–2 BCA ¶ 6649 (ASBCA 1967).

20. *Id.* at p. 30,823.

If Chugach, on being advised of the unfeasibility of the ice haul method, and of its hazards to life and property, had issued a change order prior to the fatal accident of February 1968 but at some time after it knew or should have known that performance was impossible, Northern would have been entitled to the extra costs incurred by it in seeking to perform by the impossible method after Chugach had, or should have, become aware of this impossibility. In fact, Chugach apparently recognized this principle of law, for it had agreed earlier to pay Northern an additional sum for its abortive efforts to obtain rock from the initially-designated quarry. Once alerted to the impossibility of performance by the agreed-upon ice haul method, Chugach's adamant insistence on such performance and its refusal to issue a change order should not be permitted to bar Northern's claim under the "changes" clause. It would indeed be anomalous to hold Chugach liable for such extra costs previously incurred if it belatedly provided for a change order after ascertaining the impossibility of utilizing an ice road, while absolving it from such liability when it continued to insist on an impossible and highly hazardous performance. Despite the fact that no change order was actually issued by Chugach, we hold that it should be held liable for Northern's increased costs incurred after such time as Chugach was reasonably placed on notice that it was not feasible to perform the contract by means of the ice haul method. At that time, it should either have agreed to a termination of the contract or issued a change order providing for some other method of hauling the rock. Those costs incurred by Northern thereafter in its vain attempts to perform the impossible in accordance with Chugach's demands should have been recompensed.

The case is remanded for further proceedings in accordance with this opinion. Upon remand, the court should determine

when Chugach knew or should have known of the impossibility of performance by the ice haul method; and if that date is ascertained to be prior to the actual termination of the contract, Northern should be awarded its costs incurred thereafter, the amount to be determined in accordance with the "changes" clause of the contract.[21]

Affirmed in part, reversed in part and remanded.

ERWIN and FITZGERALD, JJ., not participating.

---

21. Our decision makes it unnecessary to consider Chugach's contention on its cross-appeal

that because it was the prevailing party, it was entitled to costs and attorney's fees.