FILED
United States Court of Appeals
Tenth Circuit

August 19, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SPECIALTY BEVERAGES, L.L.C.,

    Plaintiff-Appellant-Cross-
    Appellee,

v.

PABST BREWING COMPANY,

    Defendant-Appellee-Cross-
    Appellant.

Nos. 06-6243 & 06-6250

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-04-1605-L)**

---

Robert E. Norman (Jack S. Dawson with him on the briefs), Miller Dollarhide, Oklahoma City, OK, for Plaintiff-Appellant-Cross-Appellee.

Craig W. Hoster (Michael R. Pacewicz with him on the briefs), Crowe & Dunlevy, P.C., Tulsa, OK, for Defendant-Appellee-Cross-Appellant.

---

Before **KELLY**, **EBEL**, and **MCCONNELL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Plaintiff Specialty Beverages, L.L.C. sued Defendant Pabst Brewing Company for breach of contract and fraud. Specialty Beverages and Pabst both filed motions for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The district court granted Pabst's motion regarding Specialty's fraud claim and granted Specialty's motion regarding Pabst's impossibility and impracticability defenses. The court denied Pabst's motion regarding Specialty's lost profits damages for its breach-of-contract claim. After the jury returned a verdict for Specialty on its breach-of-contract claim, the district court also denied Specialty's motion for attorneys fees pursuant to Oklahoma statute.

We hold that the district court correctly granted Specialty's motion regarding Pabst's impossibility and impracticability defenses, correctly denied Pabst's motion regarding lost profit damages, and correctly denied Specialty's motion for attorneys fees. The district court erred, however, when it granted Pabst's motion regarding Specialty's fraud claim. We exercise our jurisdiction pursuant to 28 U.S.C. § 1291, and REVERSE and REMAND for a trial on Specialty's fraud claim. We AFFIRM the district court's decision regarding all other issues raised in these appeals.

I.    Facts

The contract dispute underlying these appeals arose out of the intricacies of Oklahoma law regulating the sale of beer. Oklahoma law permits the sale of both

2

"low point" and "strong" beer. "[L]ow-point beer" includes "[a]ll beverages containing more than one-half of one percent (½ of 1%) alcohol by volume and not more than three and two-tenths percent (3.2%) alcohol by weight." Okla. Stat. tit. 37, §§ 163.1, 163.2(1). "Strong" beer contains "more than three and two-tenths percent (3.2%) alcohol by weight." See id. § 163.1. This case involves a contract for the distribution of "strong" beer.[1]

Oklahoma significantly regulates the distribution of beer (as well as wines and other intoxicating beverages). See id. §§ 501-99 (Alcoholic Beverage Control Act). That Act provides, among other things, that a brewer cannot sell beer directly to a wholesaler or retailer. Instead, Oklahoma has created a four-tiered system for selling beer: First, the brewer must sell its beer to a "non-resident seller." A "non-resident seller" must be licensed by the State of Oklahoma and is authorized "to solicit and take orders for alcoholic beverages from the holders of licenses authorized to import the same into [Oklahoma], and to ship or deliver, or cause to be shipped or delivered, alcoholic beverages into Oklahoma pursuant to such sales." Okla. Stat. tit. 37, § 524(A). In more concrete terms, the "non-resident seller" sells the beer to a licensed "wholesaler," who in turn sells the beer to a licensed retail establishment. See Okla. Stat. tit. 37,

_____

[1] For the remainder of this opinion, all references to "beer" refer to "strong" beer unless otherwise indicated.

3

§§ 518.1, 521(E), (F), 524. A brewer may have more than one non-resident seller distributing beer to Oklahoma wholesalers.

Even though they are not permitted to deliver beer to retail establishments, licensed non-resident sellers are permitted to go into licensed retail establishments to market and obtain space for their products from the retailer. A non-resident seller can also help the retail establishment order beer from that non-resident seller. The sale and delivery just has to be made through a licensed wholesaler. Thus, non-resident sellers can, in effect, work as the sales force for both the brewer and wholesaler. A non-resident seller can sell beer through, and a retail establishment can take delivery from, any number of licensed wholesalers.

This case involves a contract between Specialty Beverages, a non-resident seller licensed in Oklahoma, and Pabst, the largest brewer of strong beer doing business in Oklahoma.[2] Dennis James and Toby Tindell, along with two other "silent partners," formed Specialty Beverages in the fall of 2002, and obtained the required licensing by February 2003. Specialty Beverages was a limited liability company formed under Delaware law and, as such, was qualified to be a non-resident seller in Oklahoma. Specialty Beverages began distributing lesser known brands of beer, wine, and soda.

---

[2] At the time of this contract, Pabst was the fourth largest "brewer" in the United States, but sold the most strong beer in Oklahoma. At that time, the three larger brewers, Anheuser-Busch, Miller, and Coors, apparently decided not to sell strong beer in Oklahoma because of the convoluted nature of the state's tiered distribution system.

4

Pabst, meanwhile, had a longstanding relationship with Marrs Distributing Company, which acted as the non-resident seller of certain Pabst brands in Oklahoma.[3] Over the course of their relationship, Pabst had become increasingly dissatisfied with Marrs. One of Pabst's concerns about Marrs's performance was that Marrs did not maintain any inventory of Pabst products from which licensed wholesalers and retailers could order. Thus, wholesalers and retailers had to place orders for Pabst products several months in advance. Marrs also did not make any effort to market Pabst's brands to retail establishments, and instead relied solely on orders from wholesalers. In addition, although Pabst had authorized Marrs to distribute twenty-five Pabst brands, Marrs serviced only eight of them.

In light of Pabst's growing dissatisfaction with Marrs, Pabst's Oklahoma marketing manager, Chuck Lefholz, approached Specialty Beverages in the spring of 2003. Originally, Lefholz wanted Specialty Beverages to distribute Pabst's low point beer, but Specialty Beverages was not interested. Later that same year, Lefholz again approached Specialty Beverages, but this time, he inquired whether Specialty would distribute Pabst's strong beer.

During negotiations, Specialty Beverages and Pabst discussed Pabst's business relationship with Marrs and the concerns Pabst had about Marrs's

---

[3] Pabst sold its remaining brands through another non-resident seller, Best Brands.

performance. Regarding Pabst's contractual relationship with Marrs, Lefholz explained to Specialty Beverages that Pabst had a one-year, terminable-at-will "appointment letter" with Marrs. Although that "appointment letter" was renewable each year, it had already expired for that year and Pabst did not intend to renew it.

Despite Lefholz's belief that Pabst could terminate its relationship with Marrs, others at Pabst, specifically Rosemary Sarabia-Mata, a "distributor contract coordinator," and Yeoryios Appallas, Pabst's vice president and general counsel, warned Lefholz that, in addition to the one-page annual appointment letter it had with Marrs, Pabst also had an eighteen-page "exclusive" distributorship agreement[4] with Marrs that did not include any termination date. General Counsel Appallas opined that Pabst could terminate its written distributorship agreement with Marrs only after giving Marrs sixty days' notice and then only if Pabst could "prove that Marrs did not service and cannot service the territory assigned." Lefholz, however, rejected that interpretation of Pabst's relationship with Marrs, asserting that Oklahoma law would not recognize an exclusive distributorship agreement. Although there were a number of internal

---

[4]Pabst also had an "exclusive" agreement with its other non-resident seller in Oklahoma, Best Brands. Those agreements with both Best Brands and Marrs were correctly categorized as "exclusive" because Pabst had authorized Marrs to distribute certain Pabst brands exclusively, and Best Brands to distribute other, different Pabst brands exclusively. Pabst, therefore, had two "exclusive" distributorship agreements with two different non-resident sellers.

communications among Pabst officials concerning its contractual relationship with Marrs, no one from Pabst told Specialty Beverages about Pabst's exclusive distributorship agreement with Marrs. Toby Tindell, one of Specialty Beverages' owners, specifically testified that Specialty Beverages would never have entered into any agreement to be Pabst's non-resident seller if Specialty had known about the exclusive arrangement between Pabst and Marrs.

Lefholz eventually obtained permission from Pabst's management to notify Marrs that Pabst was not going to renew Marrs's appointment letter. Pabst sent Marrs this termination notice on April 8, 2004.

A week later, on April 15, Pabst issued Specialty Beverages an "appointment letter," "appointing" Special Beverages to be "our Nonresident Seller License for the State of Oklahoma for one year effective April 14, 2004 thru April 14, 2005 subject to Renewal at the sole discretion of Pabst Brewing Company." The appointment letter then specifically listed a number of brands of Pabst beers. Although the letter does not specifically state this, Specialty Beverages understood that "those sorts of appointment letters could be terminated on 30-days notice with or without cause."

Pabst's general counsel, Appallas, testified that, in addition to the appointment letter, he also prepared a much lengthier distributor agreement for Specialty Beverages. That agreement was similar, although not identical, to the agreement Pabst also had with Marrs. In drafting the distributor agreement for

7

Specialty Beverages, Appallas started with Pabst's standard distributor agreement and then modified it to make a one-year, non-exclusive agreement. According to Appallas, he made these modifications because Specialty Beverages was a new company without a track record. Appallas further testified that he told Lefholz to send this agreement to Specialty Beverages, along with the one-page appointment letter. Lefholz responded he would not send that distributor agreement to Specialty Beverages because all that was needed was the appointment letter. The record indicates that Pabst never sent the distribution agreement to Specialty. On April 15, 2004, Pabst sent Specialty Beverages a three-page fax consisting of a cover page, the appointment letter, and a signature page. The third page of that fax was actually the signature page from the lengthier distributor agreement, but as it was included in the fax, it appeared to be only a second signature page for the appointment letter.

The Pabst appointment letter was Specialty Beverages' big break. Although it had been distributing lesser known, smaller beverage brands, those brands did not have the volume of business that would make and keep Specialty Beverages profitable.

Specialty Beverages' plan to improve sales of Pabst beer and avoid the problems Marrs encountered was to buy a significant inventory of beer from Pabst, aggressively market Pabst products to retail establishments, and service more than just the eight Pabst brands Marrs had been distributing. In furtherance

8

of that plan, after obtaining the appointment letter, Specialty Beverages tripled its warehouse space and added temperature controls in the warehouse in order to store the beer in better conditions; added office space and administrative staff; bought a refrigerated trailer to store Pabst keg products, which had to be refrigerated rather than just air conditioned; hired a new sales force, going from one to four salespersons; hired Mike Fancher, who Pabst recommended, as Specialty Beverages' sales manager; committed money and resources to marketing; borrowed significantly more money from the bank than it otherwise would have and increased its line of credit in order to buy Pabst beer to have on hand; and bought thousands of cases of Pabst beer. Specialty Beverages had specifically refrained from taking any of these steps until it received the official appointment letter because it did not have the financial ability to makes these changes to its business unless Pabst appointed Specialty as its non-resident seller.

On April 29, 2004, two weeks after Pabst issued Specialty Beverages the appointment letter, Marrs sued Pabst in Oklahoma state court, alleging Pabst had breached the exclusive distribution agreement it had with Marrs. On May 3, 2004, Marrs obtained a temporary restraining order ("TRO") that restrained Pabst from breaching its distribution agreement with Marrs and ordered Pabst and Marrs to retain the status quo. As a result, Pabst reinstated Marrs as its exclusive distributor. The state court scheduled a hearing on Marrs's motion for a preliminary injunction for May 25, 2004. Before that hearing occurred, however,

9

Marrs and Pabst settled their dispute.  Pabst agreed to reinstate Marrs as its exclusive distributor and non-resident seller, and Marrs agreed to dismiss its complaint without prejudice.

At Pabst's urging, Specialty Beverages had already obtained a number of beer orders from retailers immediately upon receiving the appointment letter. Specialty Beverages placed its order with Pabst to fill these first retail orders and began receiving the beer from Pabst at about the time Marrs initiated litigation against Pabst.  Once the court entered the TRO in the Marrs litigation, Pabst directed Specialty Beverages not to sell any of that beer to the retailers.  "Right when [Specialty Beverages] got the beer in, of course, we were excited to . . . get it out of the building, to move it in to . . . take care of our customers, we got a . . . message from Pabst that they had an issue and not to move any beer." Using electronic transfers, Pabst still collected the money Specialty Beverages owed it for these beer shipments.

Although Specialty Beverages knew that Marrs had sued Pabst, prompting Pabst to direct Specialty not to sell any of its beer, Specialty Beverages asserts no one ever told it about the TRO.  Nor did Pabst keep Specialty otherwise informed about this litigation.  Instead, Pabst continued to assure Specialty that it would quickly resolve the dispute with Marrs.  Pabst otherwise refused to return any of Specialty's phone calls and email inquiries.  Weeks after Marrs and Pabst settled Marrs's lawsuit, Specialty Beverages was still sending Pabst emails asking about

10

developments in the lawsuit and whether there would be a hearing on Marrs's request for a preliminary injunction.

During this time, Pabst still encouraged Specialty Beverages to continue placing monthly beer orders, which Specialty did for several months.[5] Pabst, however, never delivered any more beer to Specialty. Pabst did eventually pick up some of the beer that it had already delivered to Specialty. The rest of the beer that Pabst delivered to Specialty grew stale in Specialty Beverages' warehouse. In addition, those wholesalers and retailers that had ordered Pabst products through Specialty Beverages "were all over us about why we wasn't [sic] getting them beer." Specialty Beverages' reputation among its customers was "destroyed" because Specialty could not fill any orders for Pabst products. Finally, to get Pabst's attention, Specialty Beverages stopped the electronic fund transfers to Pabst to pay for the beer Specialty had continued to order. Pabst then encouraged Specialty to negotiate with Marrs and perhaps pay to obtain the distributorship. Specialty Beverages did try to negotiate with Marrs, to no avail. By February 2005, Specialty Beverages went out of business. "We were broke, and we had no beer to sell, and our reputation was totally destroyed."

Specialty Beverages sued Pabst, in October 2004, in Oklahoma state court, and alleged both breach of contract and fraud. Pabst then removed the action to

---

[5]Specialty Beverages feared that if it did not continue making monthly beer orders, Pabst would accuse Specialty of breaching the appointment letter.

federal court on the basis of the federal court's diversity jurisdiction, see 28 U.S.C. § 1332.

The district court conducted a jury trial on these two claims. During trial, the district court granted Pabst judgment as a matter of law on Specialty Beverages' fraud claim and granted Specialty judgment as a matter of law on Pabst's impossibility and impracticability defenses. The jury then entered a verdict in Specialty Beverages' favor on the breach-of-contract claim, awarding Specialty $274,022 in damages for economic loss and $400,000 in damages for the diminished value of Specialty Beverages' business. The district court denied Specialty Beverages' motion for attorneys' fees. Both Specialty and Pabst appeal.

## II.    UCC or Oklahoma common law

Before turning to the merits, we must address an issue that both the district court and the parties overlooked: whether the Uniform Commercial Code ("UCC"), as enacted by Oklahoma, or Oklahoma common law contract principles govern these appeals.[6] Our diversity jurisdiction requires that we "ascertain and apply the state law" rather than "reach[ing] [our] own judgment regarding the substance" of the state law in question. Wade v. Emcasco Ins. Co., 483 F.3d 657, 665 (10th Cir. 2007) (internal quotation marks omitted) (quoting Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)). Generally, we would

---

[6] The parties do not dispute that Oklahoma law governs the claims at issue in the instant case.

12

follow the most recent decisions of the Oklahoma Supreme Court, id. at 665–66; however, in the case at bar, the Oklahoma Supreme Court has not considered whether the UCC or the common law governs a beer distributorship agreement. Accordingly, we must analyze decisions from the lower state courts in Oklahoma, decisions from appellate courts in other states, and decisions from the federal district courts in Oklahoma in order "to predict what [Oklahoma's] highest court would do." Id. at 666.

In Oklahoma, Article 2 of the UCC governs "transactions in goods." Okla Stat. tit. 12A, § 2-102. The statute defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Id. § 2-105(1). There is no doubt that beer satisfies the statutory definition of a "good"; however, we must determine whether a distribution contract for beer constitutes a "transaction in goods."

Although the Oklahoma Supreme Court has not yet addressed how to determine if a contract that provides both services and goods fits within Article 2's scope, it appears that Oklahoma courts would apply the "predominant factor" test utilized by most other state courts. See Gilbert Cent. Corp. v. State, 716 P.2d 654, 663 (Okla. 1986) (applying the predominant factor test in another context to determine if a highway construction contract constituted the sale of personal property); see also Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1255 n.7 (10th Cir. 2005) (noting that New York law applies the

13

predominant factor test to determine if a contract falls within the scope of Article 2); Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 770 N.E.2d 177, 194 (Ill. 2002) (applying the "predominant purpose" test to determine if Article 2 applied to an automobile dealership agreement); East Hill Marine, Inc. v. Rinker Boat Co., Inc., 229 S.W.3d 813, 818 (Tex. App. 2007) (applying the "dominant factor" test to determine if a dealership contract fit within Article 2's scope). The majority of other courts conclude that Article 2 governs distribution agreements because the sale of goods is the predominant factor.[7] See, e.g., Pepsi-Cola Bottling Co., 431 F.3d at 1255 n.7 (concluding that the predominant factor test dictates that a distributorship agreement for soft drinks fits within Article 2's scope); Intercorp, Inc. v. Pennzoil Co., 877 F.2d 1524, 1527–28 (11th Cir. 1989) (holding that Alabama law dictated that an oil products distributorship agreement fit within the scope of Article 2); Jo-Ann, Inc. v. Alfin Fragrances, Inc., 731 F. Supp. 149, 153–55 (D.N.J. 1989) (applying New Jersey law and concluding that Article 2 applied to a distributorship agreement for cosmetic products); Belleville Toyota, 770 N.E.2d at 196 (concluding that Article 2 governed an automobile dealership agreement); E. Hill Marine, Inc., 229 S.W.3d at 819–20 (applying the

---

[7] In the UCC context, decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC, and where necessary, Oklahoma courts look to decisions from other state and federal courts when analyzing common provisions of the UCC. See, e.g., Sesow v. Swearingen, 552 P.2d 705, 706 (Okla. 1976) (referring to Texas case law to resolve a UCC statutory interpretation question).

14

"dominant factor" test and determining that Article 2 applies to a boat distributorship agreement). In addition to the strong majority of jurisdictions that conclude that Article 2 governs distributorship agreements, one Oklahoma federal district court applied the UCC, without further discussion, to a distributor agreement. Phillips Machinery Co. v. LeBlond, Inc., 494 F. Supp. 318, 320 (N.D. Okla. 1980). The combination of these decisions leads us to predict that, if faced with the current situation, the Oklahoma Supreme Court would apply the UCC to the contract dispute at the heart of these appeals.

### III. Merits

Turning to the merits, we first address the three issues related to the district court's rulings on the parties' motions for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Pabst contends that the district court wrongly granted Specialty's Rule 50(a) motion regarding Pabst's impossibility and impracticability defenses and wrongly denied its motion regarding Specialty's lost profits claim. Specialty, for its part, asserts that the district court improperly granted Pabst's motion regarding Specialty's fraud claim. We address each argument in turn below.

### A. Standard of review

We review de novo a district court's decision to grant a motion for judgment as a matter of law. Haberman v. Hartford Ins. Group, 443 F.3d 1257, 1264 (10th Cir. 2006). "In diversity cases, the substantive law of the forum state

15

governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate." Id. Judgment as a matter law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). To make our determination, we may not weigh the evidence or make our own credibility determinations. Shaw v. AAA Eng'g & Drafting, 213 F.3d 519, 529 (10th Cir. 2000). Thus, after drawing all reasonable inferences in favor of the nonmoving party, see Thompson v. State Farm Fire. & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994), we may affirm a judgment as a matter of law only if "the evidence so overwhelmingly favors the moving party as to permit no other rational conclusion." Shaw, 213 F.3d at 529. In other words, "'[t]he question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party].'" Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp., 315 F.3d 1271, 1278 (10th Cir. 2003) (alterations in original).

**B.    Judgment as a matter of law on Pabst's asserted defenses of impossibility or impracticability**

Pabst contends that the district court erred when it granted Specialty judgment as a matter of law on Pabst's asserted defenses of impossibility or

16

impracticability. In response, Specialty asserts that the district court correctly granted the judgment as a matter of law because Pabst failed to demonstrate both that its performance was completely impossible and that Marrs's defense of its legal rights was objectively unforeseeable. As discussed more completely below, we conclude that the district court properly granted Specialty judgment as a matter of law on this issue because Pabst failed to present the jury with evidence sufficient to allow the jury to conclude that the defense of impossibility or impracticability excused its nonperformance.

Under Oklahoma law, the defense of impossibility of performance is a common law doctrine, see, e.g., Okla. Gas & Elec. Co. v. Pinkerton's Inc., 742 P.2d 546, 547 n.2 (Okla. 1986); however, the Oklahoma courts regularly consider this defense when analyzing contracts governed by the UCC. Golsen v. ONG W., Inc., 756 P.2d 1209, 1212 (Okla. 1988); see also Resources Inv. Corp v. Enron, 669 F. Supp. 1038, 1043 (D. Colo. 1987) (applying Oklahoma law). The Oklahoma Supreme Court has defined this doctrine as follows:

> Where, from the nature of the contract, it is evident that the parties contracted on the basis of the continued existence of the person, thing, condition, or state of things, or of facts, to which it relates, the subsequent perishing of the person or thing, or cessation of existence of the condition or state will excuse the performance, or terminate the contract, a condition to that effect being implied, in spite of the fact that the promise may have been unqualified.

Kan., Okla. & Gulf Ry. Co. v. Grand Lake Grain Co., 434 P.2d 153, 157 (Okla. 1967).

17

The Oklahoma Supreme Court has also adopted several limitations on the scope of this defense. The defense applies only if it "appear[s that] the thing to be done cannot be accomplished by any means." Id.; see also Pinkerton's, 742 P.2d at 548 ("The duty of a promisor is not discharged by the mere fact that supervening events deprived him of the ability to perform, if they are not such as to deprive other persons similarly situated of the ability to so perform."). In addition, the defense does not apply if the promisor had any reason to anticipate the facts that rendered performance impossible. Grand Lake Grain, 434 P.2d at 158. In other words, the defense is not available if a promisor was aware of a potential risk that could interfere with its performance and assumed that risk by not explicitly addressing it in the contract. Id.

Unlike impossibility of performance, impracticability is a UCC-based defense. See Okla. Stat. tit. 12A, § 2-615. That statute provides, in pertinent part: "a seller . . . is not [in] breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ." Id. § 2-615(a). Similar to the defense of impossibility, impracticability does not excuse nonperformance if the contingency was foreseeable. See id. cmt. 8 ("[T]he exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of

18

the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances."); see also Sabine Corp. v. ONG W., Inc., 725 F. Supp. 1157, 1174 (W.D. Okla. 1989) (noting that under Oklahoma law, the defense of impracticability is available only if "the occurrence making performance impracticable [was] unforeseeable").

Turning to the case at bar, we conclude that the district court correctly granted Specialty a judgment as a matter of law on both defenses because the contingency in question—the interference caused by the exclusive distribution agreement with Marrs—was foreseeable. The record indicates that Pabst anticipated that its contractual obligations to Marrs might interfere with its nascent relationship with Specialty. Pabst's general counsel testified that at the time Pabst was negotiating with Specialty, he was aware that terminating the agreement with Marrs might lead to litigation. In addition, the record indicates that the general counsel believed that the distribution agreement with Marrs was binding and that Pabst would not likely be able to cancel that contract. In light of this evidence, we conclude that the interference caused by the Marrs contract was objectively foreseeable, and thus, the defenses of impossibility and impracticability were not available to Pabst. See Sabine Corp., 725 F. Supp. at 1174; Grand Lake Grain, 434 P.2d at 158. Accordingly, the district court correctly decided that a rational jury could not find in favor of Pabst based on

19

these defenses, and therefore properly granted judgment as a matter of law on this issue.

Pabst argues that its impossibility and impracticability defenses should have survived because, although litigation between Marrs and Pabst was foreseeable, the state court grant of the TRO was not. With this tenuous nuance, however, Pabst jumps from the frying pan into the fire. In the first place, it is far from unforeseeable that Marrs might obtain a TRO to enforce the distribution agreement. Moreover, Pabst's argument fails because the TRO did not render its performance impossible or impracticable as the TRO was in place for only the short period of time. Oklahoma law dictates that a TRO may be in place only until the state court can hold a hearing on the requested preliminary injunction. Okla. Stat. tit. 12, § 1384.1. The record indicates that Marrs obtained the TRO on May 3, 2004, and that the state court set a preliminary injunction hearing for May 25, 2004. Therefore, the TRO could remain in place only for that 22-day period. In any event, Marrs and Pabst settled their dispute on May 20. Thus, after the settlement, it was Pabst's election to settle the dispute with Marrs that prohibited it from fulfilling its obligations to Specialty.

Under Oklahoma law, this type of "subjective impossibility" falls outside of the scope of the defense of impossibility. See Pinkerton's, 742 P.2d at 548 ("The duty of a promisor is not discharged by the mere fact that supervening events deprived him of the ability to so perform, if they are not such as to deprive

20

other persons similarly situated of the ability to perform."). Given the similar concerns underlying both defenses, we conclude that the Oklahoma courts would reach the same conclusion regarding the defense of impracticability. See Enron, 669 F. Supp. at 1043 (applying Oklahoma law and concluding that "[s]imilar considerations govern the claim based upon impossibility and commercial impracticability"); see also E. Capitol View Cmty. Dev. Corp, Inc., v. Robinson, 941 A.2d 1036, 1040 n.6 (D.C. 2008) (applying District of Columbia law and reaching the same conclusion); Hartman v. El Paso Natural Gas Co., 763 P.2d 1144, 1151 (N.M. 1988) (applying New Mexico law and reaching the same conclusion). Accordingly, we conclude that the district court properly granted Specialty's Rule 50(a) motion on this point.[8]

## C.    Denial of judgment as a matter of law on Specialty's lost profits claim

Pabst next contends that the district court erred when it denied Pabst's Rule 50(a) motion for a judgment as a matter of law on Speciality's lost profits damages claim. Pabst specifically argues that the court erred because Oklahoma's "new business" rule prohibits companies without an established track record from recovering lost profits damages. Specialty counters that Oklahoma would not apply a strict new business rule in this case because it is distinguishable from

---

[8] Because we conclude that the district court correctly granted Specialty's Rule 50(a) motion, we need not address Pabst's contention that the district court erred by failing to instruct the jury on its impossibility and impracticability defenses.

21

existing precedent. After reviewing Oklahoma case law, we agree that Oklahoma only requires a "reasonably accurate" estimate of future profits.[9] Thus, we conclude that the district court properly denied Pabst's Rule 50(a) motion.

The general rule under Oklahoma law allows for the recovery of anticipated lost profits if the loss is "capable of <u>reasonably accurate measurement or estimate</u>." <u>Digital Design Group, Inc. v. Info. Builders, Inc.</u>, 24 P.3d 834, 844 (Okla. 2001) (emphasis added); <u>Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.</u>, 933 P.2d 282, 292 (Okla. 1997); <u>see also</u> Okla. Stat. tit. 23, § 21 ("No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin."). The court in <u>Florafax</u> additionally explained that a plaintiff satisfies this burden by demonstrating with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered." 933 P.2d at 296. If the plaintiff satisfies this burden, then it is "proper to let the jury decide what the loss is from the best evidence the nature of the case admits." <u>Id.</u>

Pabst correctly asserts that in older cases, the Oklahoma Supreme Court limited the recovery of lost profit damages to established companies. <u>See, e.g.</u>, <u>Carpenters' Local 1686 v. Wallis</u>, 237 P.2d 905, 908 (Okla. 1951). We conclude,

[9] Although we have faced this issue before, we expressly declined to answer whether Oklahoma law would allow for lost profit damages for unestablished businesses. See <u>TK-7 Corp. v. Estate of Barbouti</u>, 993 F.2d 722, 726 (10th Cir. 1993). Therefore, we must address this issue for the first time in this appeal.

22

however, that those cases are distinguishable from the case at bar for two reasons. First, when those cases were decided, the general rule in Oklahoma prohibited the recovery of damages for <u>any</u> future profits regardless of whether the business at hand was well established. <u>See</u> <u>Wallis</u>, 237 P.2d at 908 ("As a general rule, anticipated profits of a business are too remote and speculative to warrant a judgment for their loss."). At that time, this rule was consistent with the widespread requirement that plaintiffs prove expectation damages with certainty. <u>See</u> Bernadette J. Bollas, <u>The New Business Rule and the Denial of Lost Profits</u>, 48 Ohio St. L.J. 855, 856–57 (1987). The new business rule thus operated as an <u>exception</u> to this general rule, allowing <u>established</u> businesses to recover lost future profits if they could demonstrate those losses with certainty. <u>See</u> <u>Wallis</u>, 237 P.2d at 908 ("[T]he exception to the rule is that the loss of profits from a tortious interruption of an established business may be recovered where it is made reasonably certain, by competent proof, what the amount of the loss actually is . . . ."). In other words, due to the uncertain nature of their future profits, new business ventures were essentially barred from recovering damages for future lost profits.

The current legal landscape suggests that the Oklahoma Supreme Court would not apply this strict new business rule to the case at bar because the now-applicable general rule points in the opposite direction. As discussed above, Oklahoma law now allows businesses to recover lost future profits so long as they

23

can demonstrate that those loses are "capable of reasonably accurate measurement or estimate." <u>Digital Design Group</u>, 24 P.3d at 844. Thus, because the general rule has changed, we conclude that the Oklahoma Supreme Court would allow for the recovery of reasonably estimated lost future profits, regardless of whether the business was well established.

Second, the unique factual circumstances of the instant case suggest that the new business rule would not apply because the business venture at issue was generally established. The record indicates that Specialty had been in existence for two years prior to reaching the agreement with Pabst. Thus, it was not a new enterprise. In addition, the agreement dictated that Specialty would essentially step into the shoes of Marrs, an established business. Therefore, Specialty could (and did) rely on Marrs's experiences as a baseline in order to demonstrate with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that such damages were actually suffered." <u>Florafax</u>, 933 P.2d at 296.

In light of these distinctions, we conclude that Oklahoma law would allow for Specialty to recover damages for anticipated lost profits. We must analyze the evidence presented at trial, however, to determine if the district court properly denied Pabst's Rule 50(a) motion. To recover for anticipated lost profits, Specialty must demonstrate: "1) [that] the loss is within the contemplation of the parties at the time the contract was made, 2) [that] the loss flows directly or

24

proximately from the breach. . . and 3) [that] the loss is capable of reasonably accurate measurement or estimate." Florafax, 933 P.2d at 292.

The record unambiguously demonstrates that Specialty presented a "legally sufficient evidentiary basis" for the jury to award anticipated lost profits to Specialty.[10] First, there is no question that lost profit damages were within the contemplation of the parties when Pabst issued the appointment letter. This is not a circumstance where the lost profit damages depended upon a potentially unknown collateral contract. See, e.g., Ft. Smith & W.R. Co. v. Williams, 121 P. 275, 277 (Okla. 1912) (holding that lost profit damages were permissible because the defendant railroad shipper was aware of the need to deliver equipment on time so that plaintiff could fulfill his contract to provide a merry-go-round at a two-day picnic). Instead, at the time Pabst and Specialty reached their agreement, Pabst was directly aware that Specialty would earn a profit by reselling beer purchased from Pabst to local wholesalers.

----

[10] At trial, the parties divided economic damages into two classes: anticipated lost profits and diminution in value. We have recognized, however, that the diminution in value calculation depends on a firm's projected profit stream, and thus, that an award for both diminution in value and lost profits can be duplicative. See Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1236 (10th Cir. 2003) ("Because fair market value, by definition, includes expected earnings and expenses, courts have generally held a plaintiff may not recover diminution in value damages and lost profits."). In the instant case, however, Pabst waived any argument regarding the duplicative nature of the damage award by failing to raise the argument to this court. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

25

Second, there is no doubt that the breach directly caused the loss and that the lost profits and diminution of value were capable of reasonably accurate estimate. Specialty's expert testified extensively regarding his calculations of both lost profits and diminution in value. The expert explained that he extensively tested the pro forma calculations of Specialty's projected profit and expenses during the twelve-month period the appointment letter from Pabst would have covered. The expert also testified that he analyzed Specialty's accounting records as part of his examination. Finally, the expert testified about the methods he used to calculate the diminution of value. In light of this evidence, Specialty provided the jury with a legally sufficient basis on which to award Specialty economic damages for both lost profits and diminution in value, and accordingly, the district court did not err when it denied Pabst's Rule 50(a) on this issue.[11]

**D.      Judgment as a matter of law on Specialty's fraud claim**

Specialty claims that the district court wrongly granted Pabst's motion for judgment as a matter of law on Specialty's fraud claim. Before turning to the merits on this issue, however, we briefly consider a threshold issue—whether Oklahoma law allows a plaintiff to bring simultaneous claims for fraud and breach of contract. Oklahoma law on this point is well settled. While a party may not obtain double recovery, election of remedies is not required. See Rogers

---

[11] Because we conclude that the district court correctly denied Pabst's Rule 50(a) motion, we need not address Pabst's contention that the district court erred by instructing the jury on lost profits damages.

26

v. Meiser, 68 P.3d 967, 970 n.5 (Okla. 2003); Howell v. James, 818 P.2d 444, 447–48 (Okla. 1991).  Accordingly, Specialty was free to pursue both fraud and breach-of-contract claims.[12]

We turn, then, to the merits of Specialty's fraud claim.  That claim, as set forth in the pretrial order, is based on the theory that "Pabst knowingly and willfully misrepresented to Specialty the nature of Pabst's agreement with Marrs. Specifically, Specialty alleges that Pabst represented that Marrs merely had an expired one year letter agreement . . . that Pabst was not going to renew."  "Pabst knowingly failed to inform Specialty that Pabst and Marrs actually had an exclusive distributor agreement with no expiration date."  As a result, "Specialty alleges that it entered into the letter agreement with Pabst, hired a sales manager, rented additional warehouse space, incurred new debt, purchased beer from Pabst, and took orders from customers in reliance upon Pabst's representations." Finally, "Specialty alleges that had it known Pabst's representations were untrue, it would not have done any of these things."

Oklahoma recognizes several different theories that would support a fraud claim.  Specialty Beverages presented sufficient evidence to withstand Pabst's Rule 50 motion under at least one of those theories.

---

[12] We specifically caution, however, against a duplicative damages award for both fraud and breach of contract.  On remand, the district court must be mindful of the damages award for breach of contract and must take care that any damages due to the fraud do not doubly compensate Specialty.

27

Oklahoma Stat. tit. 15, § 59 establishes a cause of action for constructive fraud. Constructive fraud occurs:

> 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
>
> 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

Okla. Stat. tit. 15, § 59. As specifically relevant here, "[c]onstructive fraud is 'the concealment of material facts which one is bound under the circumstances to disclose.'" Bankers Trust Co. v. Brown, 107 P.3d 609, 613 (Okla. Civ. App. 2004) (quoting Varn v. Maloney, 516 P.2d 1328, 1332 (Okla. 1973)).

To recover under a theory of constructive fraud, Specialty Beverages must prove:

> (1) That the defendant owed plaintiff a duty of full disclosure. This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff. This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter;
>
> (2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;
>
> (3) That the defendant's misstatement or omission was material;
>
> (4) That plaintiff relied on defendant's material misstatement or omission; and
>
> (5) That plaintiff suffered damages as a result of defendant's material misstatement or omission.

28

Lillard v. Stockton, 267 F. Supp. 2d 1081, 1113 (N.D. Okla. 2003) (applying Oklahoma law; emphasis added). There is no requirement, however, that the plaintiff prove that the defendant acted with the intent to deceive. See State ex rel. Okla. Bar Ass'n v. Lloyd, 787 P.2d 855, 860 n.16 (Okla. 1990); Doerr v. Henry, 806 P.2d 669, 673 (Okla Civ. App. 1991).

Although to recover a plaintiff must ultimately prove fraud by clear and convincing evidence, "it is not necessary that evidence of fraud be 'clear and convincing' to escape a demurrer to the evidence. However, there must be evidence of each element of fraud presented before the issue may be submitted to the jury."[13] P.E.A.C.E. Corp. v. Okla. Natural Gas Co., 568 P.2d 1273, 1277 (Okla. 1977); see also Roberts, 990 F.2d at 1173; Silk v. Phillips Petroleum Co., 760 P.2d 174, 177 (Okla. 1988); see also Barnett v. Life Ins. Co. of the S.W., 562 F.2d 15, 19 (10th Cir. 1977). "The existence of fraud, given evidence for each element, is a question of fact for the jury." Murray v. D&J Motor Co., 958 P.2d 823, 831 (Okla. Civ. App. 1998) (citing Silk, 760 P.2d 174).

## 1. Duty to speak

---

[13]"[B]ecause fraud is never presumed, the mere allegation of fraud alone will not justify the submission of that issue to the jury unless facts are produced from which an *irresistible deduction of fraud reasonably arises*.'" Roberts v. Wells Fargo AG Credit Corp., 990 F.2d 1169, 1173 (10th Cir. 1993) (quotations, citation omitted). In Roberts, for example, this court, applying Oklahoma law, held that an irresistible deduction of fraud did not reasonably arise from the lone fact that the defendant breached the contract. See id. at 1173.

29

Oklahoma law does not restrict the duty necessary for a constructive fraud claim to a general fiduciary duty. Instead, the requisite duty may arise if a party selectively discloses facts that create a false impression. See Uptegraft v. Dome Petroleum Corp., 764 P.2d 1350, 1353 (Okla. 1988) ("The duty to speak arose when the defendant began negotiations; on disclosing in part the pertinent facts, such duty would be breached by withholding other pertinent facts. A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth."). In other words, "[o]ne conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud even though his statement is true as far as it goes, since concealment is in effect a false representation that what is disclosed is the whole truth." Roberts Ranch Co. v. Exxon Corp., 43 F. Supp. 2d 1252, 1259 n.12 (W.D. Okla. 1997)(applying Oklahoma law); see also Gentry v. Am. Motorist Ins. Co., 867 P.2d 468, 472 n.3 (Okla. 1994) ("'If on account of peculiar circumstances there is a positive duty on the part of one of the parties to a contract to speak, and he remains silent to his benefit and to the detriment of the other party, the failure to speak constitutes fraud.'") (quoting Hubbard v. Bryson, 474 P.2d 407, 410 (Okla. 1970)); Uptegraft, 764 P.2d at 1353 (noting that, "although one may not be under a duty to speak, if he undertakes to do so he must speak the truth and not suppress the facts within his knowledge or materially qualify those stated"); id. at 1353-54 ("Although a party may keep absolute silence and violate no rule of equity, yet, if

30

he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth").

In the instant case, Specialty Beverages' evidence demonstrates that a reasonable jury could conclude that Pabst owed Specialty such a duty. During their negotiation of the appointment letter, Pabst chose to speak to Specialty Beverages about Pabst's contractual relationship with Marrs, telling Specialty that Pabst had a one-year appointment letter with Marrs that had already expired and that Pabst did not intend to renew. By not fully disclosing its contractual relationship with Marrs—that Pabst also had an exclusive distributor agreement that could only be cancelled in limited circumstances—Pabst created a false impression and thereby had a duty to correct that misrepresentation. See Uptegraft, 764 P.2d at 1353 (noting duty to speak arose when party made only partial disclosure during negotiations; Doerr, 806 P.2d at 669-71, 673; cf. Gentry, 867 P.2d at 472 & n.3 (holding insurance company's agent had "special duty" to disclose exclusions when he sold policy to insured).

### 2. Failure to disclose

In light of our determination regarding Pabst's duty of full disclosure, we have little trouble concluding that Pabst failed to disclose the complete facts of its contractual relationship with Marrs. Toby Tindell and Mike Francher, two Specialty employees, testified that, while Pabst informed them about the appointment letter with Marrs, it did not tell them about the exclusive distributor

31

agreement with Marrs. The failure to disclose this fact was sufficient to satisfy this element. See Doerr, 806 P.2d at 674 (holding that the sellers' failure to disclose their uncertainty regarding the boundaries of the property satisfied the failure to disclose element because the sellers had described the property boundaries to the buyers).

### 3. Materiality, Reliance, & Damages

We similarly have no doubt that Specialty relied on Pabst's failure to disclose the material nature of its relationship with Marrs and that Speciality suffered damages as a result. Toby Tindell testified that Specialty would not have entered into any agreement with Pabst if it had been aware of the full extent of the relationship between Pabst and Marrs. Tindell also testified that Specialty expanded its warehouse capacity, hired additional staff, increased its credit line, and arranged for refrigeration capacity after Pabst sent it the appointment letter.

### 4. Conclusion

Specialty, thus, presented sufficient evidence on each element of a constructive fraud claim under Okla. Stat. tit. 15, § 59. "The existence of fraud, given evidence for each element, is a question of fact for the jury." Murray, 958 P.2d at 831 (citing Silk, 760 P.2d 174). We therefore hold that the district court improperly granted Pabst's Rule 50(a) motion on Specialty's fraud claim.

Although the parties address constructive fraud here, the pretrial order itself did not limit Specialty Beverages fraud claim to a theory of constructive

32

fraud. It may be that Specialty's evidence would also support a fraud claim under another theory recognized under Oklahoma law.[14] We need not decide that here, but leave it instead for the parties to determine on remand what fraud theories, pled in district court, that Specialty's evidence would support.

## III.  Attorneys' fees

With the judgment as a matter of law issues resolved, we turn to the final issue on appeal. We review the district court's decision to deny Specialty's request for attorneys' fees for an abuse of discretion. In re Meridian Reserve, Inc., 87 F.3d 406, 409 (10th Cir. 1996). In the course of our analysis, we review de novo "any statutory interpretation or other legal analysis underlying the district court's decision" and review for clear error "any supporting findings of fact." Id.

The Oklahoma statute at issue provides:

> In any civil action to recover for labor or services rendered, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

---

[14]In addition to Okla. Stat. tit. 15, § 59's constructive fraud theory, Oklahoma law also recognizes statutory causes of action for actual fraud, see id. § 58, and deceit, see Okla. Stat. tit. 76, § 2, which some Oklahoma courts refer to as fraud, see Cooper v. Parker-Hughey, 894 P.2d 1096, 1099-1100 (Okla. 1995). In addition to these statutory causes of action, Oklahoma courts have also recognized theories of actual and constructive fraud not specifically linked to a statute. See Manokoune v. State Farm Mut. Auto. Ins. Co., 145 P.3d 1081, 1086-87 (Okla. 2006); Patel v. OMH Med. Ctr., Inc., 987 P.2d 1185, 1199 (Okla. 1999).

Okla. Stat. tit. 12, § 936.  Pursuant to this statute, Specialty contends that it is entitled to reasonable attorney fees because its agreement with Pabst constitutes a "contract relating to the purchase or sale of goods."  Pabst asserts, on the other hand, that § 936 is inapplicable to the instant case because the Oklahoma Supreme Court has consistently applied a narrow interpretation to the statute. After reviewing the most recent opinions from the Oklahoma Supreme Court, we find Pabst's argument more persuasive and thus conclude that the district court correctly denied Specialty's motion.

In a case addressing § 936, the Oklahoma Supreme Court explained that "[t]he American Rule is firmly established in this jurisdiction," and that "[e]xceptions to the American Rule are narrowly defined."  Kay v. Venezuelan Sun Oil Co., 806 P.2d 648, 650 (Okla. 1991).  Against this backdrop, the court then interpreted the scheme for attorney fees provided by § 936.  The court explained that the statute originally provided only for attorney fees in suits for collecting amounts due on open accounts.  Id. at 651.  The court further explained that the Oklahoma legislature later amended the statute to include the seven additional categories.  Id.  In light of this statutory history, the court concluded that the statute allowed for attorney fee awards only when the prevailing party sought to collect "money judgments for debts created by the contracts enumerated in the statute."  Id. at 651-52.  In other words, § 936 applies only to "actions for

34

the collection of monetary consideration promised as payment for the receipt of property, labor or services." Id. at 651 n.12 (emphasis added).

Consistent with this narrow interpretation, the Oklahoma Supreme Court has held that actions for breach of contract for the performance of labor and services do not fit within § 936's narrow confines. See Holbert v. Echeverria, 744 P.2d 960, 966 (Okla. 1987), superseded by statute on other grounds Walls v. Am. Tobacco Co., 11 P.3d 626 (Okla. 2000). In Holbert, the plaintiffs sued a contractor after he refused to sell them a completed house at a previously agreed upon price. Id. at 961-62. The contractor contended that the plaintiffs altered the architectural plans for the house several times, which resulted in the price increase. Id. at 961. The Oklahoma Supreme Court held that § 936 did not apply to this suit because the plaintiffs sought to recover for breach of the sales contract rather than for compensation for labor and services. See id. at 966 & n.25 (holding that the court must look to the "underlying nature of the suit" to determine if § 936 applies).

Specialty contends that, while the Oklahoma Supreme Court has narrowly interpreted § 936 as it applies to labor or services contracts, the plain language of the statute mandates a broader interpretation for a "contract relating to the purchase or sale of goods." Okla. Stat. tit 12, § 936 (emphasis added). In support of this argument, Specialty cites an Oklahoma Supreme Court case that predates Kay. See Hardesty v. Andro Corp., 555 P.2d 1030 (Okla. 1976). In that case, the

35

court applied an expansive interpretation of the term "relating to" and thus concluded that § 936 allowed for attorney fees in a case involving a breach of warranty. Id. at 1035-36. Although Hardesty has not been expressly overruled and may support Specialty's argument, our precedent mandates that we look to the most recent decisions from the Oklahoma Supreme Court. See Wade, 483 F.3d at 665–66. In Kay and Holbert, that court more recently explained that § 936 allows for attorney fees only where a party is seeking to collect "monetary consideration promised as payment for the receipt of property, labor or services." Kay, 806 P.2d at 651 n.12; see also Holbert, 744 P.2d at 966. In addition, we have previously decided that the Oklahoma Supreme Court narrowly interprets all provisions of § 936. See Meridian Reserve, 87 F.3d at 411 ("In particular, more recent Oklahoma cases have adopted a strict interpretation of the statute in *all* cases, not just those dealing with the 'labor or services' clause."). Accordingly, we decline Specialty's invitation to interpret broadly the statute's provision regarding contracts for the purchase or sale of goods.

In the instant case, the gravamen of Specialty's complaint was to recover lost profits for Pabst's breach of their agreement. Specialty did not seek to recover amounts owed to it by Pabst for the purchase or sale of beer. Accordingly, the district court correctly denied Specialty's motion for attorney fees after concluding that § 936 does not provide for such fees in the instant case.

**IV.**

36

In light of our discussion above, we conclude that the district court erred only with respect to its decision on Pabst's Rule 50(a) motion regarding Specialty's fraud claim. Due to this error, we REVERSE the district court's decision granting Pabst a judgment as a matter of law on the fraud claim, and REMAND for proceedings consistent with this decision. We AFFIRM the district court's decision regarding all other issues raised in these appeals.